NOTICE

Decision filed 04/29/20. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2020 IL App (5th) 170073-U

NO. 5-17-0073

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 14-CF-215 |
| | ) | |
| MOHAMMED A. ABUHARBA, | ) | Honorable |
| | ) | Zina R. Cruse, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE BOIE delivered the judgment of the court.
Justices Moore and Overstreet concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court did not commit plain error in allowing testimony concerning weapons and defendant's sentence is not excessive where it is within the statutory range; however, we remand for additional *Krankel* proceedings on defendant's claim of ineffective assistance of counsel.

¶ 2    On April 12, 2016, defendant, Mohammed A. Abuharba, was convicted of first degree murder in connection with the February 6, 2014, death of William E. Harriel Jr. The trial court also found that the State had proven that defendant had discharged a firearm that had caused the death of another person during the commission of first degree murder. On October 4, 2016, defendant was sentenced to 50 years' imprisonment and 3 years' mandatory supervised release.

1

¶ 3    On direct appeal from his conviction and sentence, defendant argues: (1) that the trial court abused its discretion when it permitted testimony concerning weapons that were not connected to defendant or the death of Harriel; (2) that defendant's *pro se* posttrial allegations of ineffective assistance of counsel showed possible neglect by defense counsel; and (3) that the trial court imposed an excessive sentence. For the following reasons, we affirm the judgment of the trial court on defendant's conviction and sentence but remand for additional *Krankel*[1] proceedings on defendant's claim of ineffective assistance of counsel.

¶ 4                                    I. BACKGROUND

¶ 5    On February 6, 2014, Nicole Odom was in her home in Cahokia, Illinois, when she heard a single gunshot. Odom had not heard any type of altercation or any vehicles entering or leaving the area prior to hearing the gunshot. When Odom looked outside, she saw an individual lying in the middle of the street. She did not see anyone else. Odom remained in her home and contacted 9-1-1. The 9-1-1 call was recorded at 9:24 p.m. on February 6, 2014. The individual lying in the middle of the street was dead of a gunshot wound to his forehead and was later identified as Harriel. A single .32-caliber casing was found on the street near Harriel's body, but the murder weapon was never recovered.

¶ 6    Harriel and defendant were roommates. Harriel's younger brother, Joseph Harriel, also resided in the home. All three individuals had keys to enter the residence. Harriel was

---

[1]Hearings investigating *pro se* claims of ineffective assistance of counsel held pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984), are commonly referred to as *Krankel* hearings.

having financial difficulties, and his fiancée, Whitlee Latham, along with several family members, had been assisting him financially.

¶ 7 According to defendant's testimony, sometime in January 2014, defendant's large, flat-screen television was stolen from the residence he shared with Harriel. Defendant stated that he had believed that an individual who had recently visited the residence had stolen the television, but after his arrest, defendant discovered that Harriel had stolen his television.

¶ 8 Defendant testified that on February 6, 2014, the day of Harriel's death, he left work around 8 p.m. and arrived at his mother's house around 8:30 p.m. Defendant stated that he watched some television, smoked marijuana, and left his mother's home around 9 p.m. to walk to the location of a friend, David Grinston, to purchase marijuana. Grinston was at the residence of his girlfriend, Reann Fears. Defendant claimed that he arrived at Fears' residence around 9:25 p.m. or 9:30 p.m. and Grinston was there with Fears and her mother. Defendant bought some marijuana, and he and Grinston smoked the marijuana in the basement of the Fears' home. Shortly thereafter, Fears threw birthday cake in Grinston's face and Fears' mother recorded the event on Fears' cellular telephone. The 31-second-long video, taken on February 6, 2014, at 9:50 p.m., shows defendant in the video.

¶ 9 Fears testified that defendant arrived around 10 p.m. and requested a change of clothes. Grinston provided defendant a black top and some pants and defendant changed his clothing in the bathroom. Fears stated that she overheard defendant and Grinston say the words "gun" and "kill." According to Fears' testimony, defendant stayed for about 20 minutes and then left, taking with him the clothes he was wearing when he arrived.

3

¶ 10    Grinston testified that around 10 p.m. on February 6, 2014, he was with Fears and her mother when defendant arrived. Grinston stated that he had a close relationship with defendant and defendant's mother, Glenna Jines. When defendant arrived, Grinston stated defendant went into the bathroom and changed clothes. Grinston testified that, after defendant changed clothes, he and defendant had a private conversation off by the back door, and during that conversation, defendant told Grinston, "he ain't getting up from that one" because "he took one to the head, to the—to the dome." At first, Grinston testified that defendant did not mention a name, but later in his testimony, Grinston stated that defendant said it was "Woo." Grinston testified that he told defendant to leave because he did not want to be "around nothing like that."

¶ 11    Grinston acknowledged under oath that he had been smoking marijuana (about 40 marijuana cigars) and drinking beer (about 28 cans) throughout the day, so Grinston was high and drunk when defendant arrived. Grinston testified that he had "memory problems" since elementary school and had been prescribed medication but that he no longer took the medication. Grinston further acknowledged that he lied to law enforcement when he was first interviewed because he was afraid for his safety.

¶ 12    The trial court conducted its own examination of Grinston as follows, in relevant part:

> "THE COURT: I don't care who's in this room.
>
> THE WITNESS: Yes, ma'am.

4

THE COURT: I don't care who is giving the stink eye that I noticed. I don't care about who your people were, who you were down with. None of that.

THE WITNESS: Yes, ma'am.

THE COURT: What I want to know is did this conversation happen about he ain't getting up from that one, took one to the dome, he over with referring to Woo? Did it happen?

THE WITNESS: Yes, ma'am."

¶ 13 According to the testimony of Scott Toth, an investigator with the St. Clair County Sheriff's Department, no weapons were found at the Fears' residence. Grinston, however, had informed law enforcement that he had guns at his residence, and the major case squad recovered a starter pistol and a .22-caliber gun from Grinston's residence. Thomas Edward Gamboe Jr., a forensic scientist with the Illinois State Police, testified that he analyzed a discharged Winchester brand .32-caliber cartridge case found at the crime scene near Harriel's body, a .32-caliber fired bullet recovered from Harriel's autopsy, and a .22-caliber semiautomatic pistol recovered from Grinston's residence. According to Gamboe's testimony, the .22-caliber semiautomatic pistol recovered from Grinston's residence could not have fired the .32-caliber bullet recovered from Harriel's autopsy.

¶ 14 Defendant testified that he had loaned Grinston the .22-caliber semiautomatic pistol and that Grinston had, at various times, loaned the defendant the following weapons: a .44 Magnum gun, a .357-caliber gun, a .38-caliber snub nose gun, a .22-caliber gun, and a

5

.380-caliber gun. Defendant, however, stated that Grinston had never loaned defendant a .32-caliber gun.

¶ 15    Harriel's brother, Joseph,[2] testified that there was a gun in the residence that he shared with defendant and that the gun belonged to defendant. According to Joseph's testimony, on February 2, 2014, defendant's brother came over to the house, went into defendant's bedroom, and retrieved the gun from under defendant's bed. Joseph described the gun as a small, black, automatic gun. Defendant's brother then took out the clip, placed the clip back into the gun, and placed the gun in the pocket of his hoodie. Joseph testified that defendant's brother left the house and Joseph did not see the gun again. Joseph stated that he did not know what type of gun it was until he "googled it." Joseph admitted that he did not actually see defendant's brother get the gun from under defendant's bed, but that he heard "the bed spring hit the bed."

¶ 16    Whitlee Latham testified that she was Harriel's fiancée and that they had three children together. Latham stated that Harriel was also known by the nicknames "Will" and "Lil Woo." Latham stated that she lived in another state but had met defendant on two or three occasions when visiting Harriel and had also met two of defendant's brothers.

¶ 17    Latham testified that about a week before Harriel's death, Harriel told her that he was planning on stealing defendant's television. Latham stated that on February 5, 2014, she was on the telephone with Harriel at approximately 8:20 p.m. and that the conversation lasted approximately 16 minutes. Latham stated that, during the conversation, she heard a

[2]The court will refer to Harriel's brother by his first name to avoid any potential confusion with the victim.

knock on Harriel's front door. Latham testified that she heard Harriel unlock and open the door and then walk back into his bedroom. Latham stated that she heard defendant ask Harriel, "Where's Little Joe at?" Latham also overheard Harriel ask defendant if defendant had heard anything about his missing television. Harriel then told Latham that he would call her back and terminated the conversation.

¶ 18    Latham admitted that Harriel never identified the individual he was speaking with, but testified that she recognized defendant's voice. She further testified that she could distinguish defendant's voice from those of defendant's brothers. However, Latham acknowledged that during her videotaped statement to law enforcement, she stated that she had, at times, confused defendant's voice with the voice of one of defendant's brothers. According to Latham's testimony, she had confused defendant's voice until she had visited several times and stated that she was positive it was the defendant she heard while on the telephone with Harriel on February 6, 2014.

¶ 19    During defendant's testimony, he denied being at their shared residence and speaking with Harriel on the evening of February 6, 2014. Defendant also testified that he would not have knocked on the front door since he had a key to the residence.

¶ 20    Scott Toth, the investigator with the St. Clair County Sheriff's Department noted above, testified that on February 11, 2014, at 11:55 a.m., defendant made a telephone call from the St. Clair County jail. A recording of the telephone call was played in open court. According to Toth's testimony, defendant told his brother during the telephone call, to "get rid of something for me" and "to hit the streets and find [Grinston] and take care of him." During defendant's testimony, however, defendant explained that when he told his brother

7

"I want you to get rid of something for me" and to find Grinston, it was an attempt to convey to his brother that defendant wanted to get rid of the .22-caliber pistol he had loaned to Grinston so that Grinston would not get caught with an illegal weapon.

¶ 21 On January 25 and April 11 and 12, 2016, the trial court conducted a bench trial. After considering the testimony and evidence presented, the trial court found defendant guilty of first degree murder and also found that defendant personally discharged a firearm that proximately caused death to another person during the commission of first degree murder.

¶ 22 Defendant filed a *pro se* motion for new trial on April 26, 2016. The *pro se* motion for new trial alleged, *inter alia*, that:

> "2.) Actual and substantial prejudice to the Defendant has resulted from the presiding [judge] making inappropriate and unethical comments about the looks on the faces of the Defendant's family, and questioning the State's Star witness in an aggressive and intimidating manner during the commencement of trial proceedings on April 11, 2016. ALSO due to the Defense counsol's [*sic*] negligence to object, or terminate trial proceedings due to such prejudice to preclude the propensity of an unfair trial. *** Failure by the Defense counsol [*sic*] to object or stop the trial process and deem it a mistrial due to the critical and vital those issues was is ineffective assistance of counsel in its purest form."

¶ 23 On June 13, 2016, defendant filed a *pro se* supplemental motion for new trial. The supplemental motion for new trial alleged, *inter alia*, that:

8

"5.) Trial counsel for the Defendant was negligent and ineffective in that, the defense counsel failed to stop the trial due to the children of the victim's family crying the courtroom during the commencement of trial proceedings, which could have influenced the outcome of the Defendant's trial. Also the defense counsel failed to object to and/or terminate trial proceedings when the trial judge abandoned her position as the neutral arbiter and acted as an advocate for the State. Failure by the defense counsel to object to, or stop the trial process and deem it a mistrial due to such critical and vital issues was ineffective assistance of counsel at its purest form, which violated the Defendant's Sixth Amendment rights. Which is the right to competent and effective assistance of counsel. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525 (1975)."

¶ 24 Defendant's counsel filed a motion for new trial on June 27, 2016. The motion for new trial alleged that the trial court erred in: (1) denying defendant's motions for directed judgments; (2) rendering a verdict of guilty; (3) conducting its own examination of defendant and Grinston; (4) allowing Grinston to be pressured by individuals in the courtroom; (5) evaluating the credibility of several witnesses; and (6) limiting defense counsel's cross-examination of some of the witnesses.

¶ 25 On June 28, 2016, the trial court conducted a *Krankel* hearing concerning defendant's claims of ineffective assistance of counsel contained in his *pro se* filings for a new trial. The trial court noted that defendant's supplemental motion for new trial indicated that defendant believed he had received ineffective assistance of counsel because: (1) trial

9

counsel failed to stop the trial due to the children of the victim's family crying; (2) failed to object and/or terminate the trial proceedings when the judge abandoned her position and acted as an advocate for the State; and (3) failed to object and/or stop the trial and deem it a mistrial on critical and vital issues. The trial court informed defendant that "critical and vital issues" was a vague statement and inquired as to any specific allegations concerning "critical and vital issues" that defendant believed would give rise to ineffective assistance of counsel.

¶ 26    In response, defendant informed the trial court that he had been given limited access to the discovery produced in his case since Illinois Supreme Court Rule 415(c) required that the custody of the discovery remain with defendant's counsel. Defendant further stated that, during his bench trial, he had to mention things to his counsel that were critical to a witness's credibility so that his defense counsel could cross-examine the witness about that issue. Specifically, defendant stated:

> "I—well, during—during trial, I brought it to his attention. And he said, 'Well, I didn't see that in the paperwork.' And I said, 'It's not in the paperwork. It's in the actual DVDs,[3]' which I seen *** when I had my public defender *** so all the other DVDs, I never got to see."

Upon further questioning by the trial court, the defendant stated that he believed he could have contributed more to his defense if he had been given the opportunity to review all of the DVDs produced in discovery.

---

[3]Digital video disc commonly referred to as a DVD.

10

¶ 27　The trial court asked defendant's counsel if there was anything he would like to add or ask of the defendant. Defendant's counsel stated that he did not have anything to ask the defendant but noted that the question concerning the witness's credibility was, in fact, asked during cross-examination of the witness. The trial court then inquired whether the State had anything that it wished to contribute. The State declined any participation, citing *People v. Jolly*.[4] The trial court took the matter under advisement and issued a written order on August 9, 2016, as follows:

> "The defendant raised issues of ineffective assistance of counsel (Supp. Mtn for New Trial) filed 6-13-16[.] After initial inquiry by the court (per *Krankel*) as to Defendant's claim of ineffective assistance of counsel, the court finds there is no basis for the claim."

¶ 28　On October 4, 2016, the trial court conducted a sentencing hearing. At the beginning of the sentencing hearing, the following dialogue transpired:

> "THE COURT: Have you had ample opportunity to prepare for the sentencing and discuss the sentencing range and your presentence investigation and report with your attorney?
>
> THE DEFENDANT: Sure.
>
> THE COURT: Is that 'yes'?
>
> THE DEFENDANT: Yeah.
>
> THE COURT: I'm sorry?

---

[4]In *People v. Jolly*, 2014 IL 117142, ¶ 38, the Illinois Supreme Court stated that the State's participation at a preliminary *Krankel* inquiry, if any, should be *de minimis*.

THE DEFENDANT: Yeah.

THE COURT: 'Yes'?

THE DEFENDANT: Yes.

* * *

THE COURT: Have the parties received the presentence investigation and report?

[DEFENSE COUNSEL]: Yes, Your Honor.

[STATE COUNSEL]: Yes, Your Honor.

THE COURT: From the State, any corrections, deletions, amendments?

[STATE COUNSEL]: No, Your Honor.

THE COURT: From the defenses?

[DEFENSE COUNSEL]: No, Your Honor."

Later in the sentencing hearing, the trial court inquired:

"THE COURT: [Defense counsel], would you like to offer anything in mitigation?

[DEFENSE COUNSEL]: We have no evidence, Your Honor."

Upon completion of the hearing, defendant was sentenced to 50 years' imprisonment and 3 years' mandatory supervised release.

¶ 29 The defendant now argues on appeal: (1) that the trial court abused its discretion when it permitted testimony concerning weapons that were not connected to defendant or the death of Harriel; (2) that defendant's *pro se* posttrial allegations of ineffective

12

assistance of counsel showed possible neglect by defense counsel; and (3) that the trial court imposed an excessive sentence. We will address each issue in turn.

¶ 30                                    II. ANALYSIS

¶ 31    Before proceeding with our analysis, we note that defendant filed two motions to cite additional authority on appeal, *People v. Roddis*, 2020 IL 124352, and *People v. Jackson*, 2020 IL 124112. Both motions were granted by this court, and we considered the reasoning and holdings in these recent Illinois Supreme Court cases in our analysis below.

¶ 32                    A. Testimony Related to Weapons

¶ 33    Defendant argues that he was substantially prejudiced by the State's evidence of multiple guns that were not connected to defendant and could not have caused the death of Harriel. According to defendant, the trial court committed reversable error by allowing the admission of other gun evidence because it suggested that defendant was a dangerous criminal who possessed a plethora of weapons and insinuated that defendant was involved in additional criminal conduct other than the isolated shooting for which defendant was being tried. Defendant further argues that, although this issue was not properly preserved, this court should review this issue for plain error.

¶ 34    The plain-error doctrine allows a reviewing court to bypass normal forfeiture principles and consider unpreserved error when either (1) the evidence is close, regardless of the seriousness of the error, or (2) the error is serious, regardless of the closeness of the evidence. *People v. Herron*, 215 Ill. 2d 167, 187 (2005). Where the evidence is close, the defendant must prove prejudicial error. "That is, the defendant must show both that there

13

was plain error and that the evidence was so closely balanced that the error alone severely threatened to tip the scales of justice against him." *Id.*

¶ 35 Where the error is serious, the defendant must prove that there was plain error and that the error was so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. *People v. Keene*, 169 Ill. 2d 1, 17 (1995). In both instances, the burden of persuasion rests with the defendant. *Herron*, 215 Ill. 2d at 187.

¶ 36 Here, defendant argues that the trial court committed prejudicial error when it permitted, *inter alia*, Joseph's testimony regarding the gun removed from defendant's bedroom; Toth, Gamboe, and Grinston's testimonies concerning the weapon recovered from Grinston's residence; and defendant's statements pertaining to various weapons during his interview with law enforcement. It is defendant's position that he has met both justifications for a plain error review since the introduction of the weapons evidence interfered with the integrity of the judicial process and violated defendant's substantial rights to be tried by an unbiased trial court. Further, defendant asserts that the evidence was closely balanced, and the trial court may have reached a different result had the weapons evidence not been introduced.

¶ 37 Under either prong of the plain-error doctrine, the initial analytical step is determining whether there was a clear or obvious error at trial. *People v. Sebby*, 2017 IL 119445, ¶ 49. The admission of evidence is within the sound discretion of the trial court. *People v. Becker*, 239 Ill. 2d 215, 234 (2010). "Evidence is admissible if it is relevant to an issue in dispute and its probative value is not substantially outweighed by its prejudicial

14

effect. [Citations.] Relevant evidence is defined as evidence having any tendency to make the existence of a fact that is of consequence to the determination of the action more or less probable than it would be without the evidence." *People v. Gonzalez*, 142 Ill. 2d 481, 487-88 (1991).

¶ 38 Generally, neither a weapon itself nor testimony about the weapon is admissible unless there is evidence to connect the weapon to the offense charged. *People v. Suerth*, 97 Ill. App. 3d 1005, 1013 (1981). A connection exists if the weapon is suitable to commit the crime charged. *People v. Wade*, 51 Ill. App. 3d 721, 729 (1977). A connection can be established where there is (1) sufficient testimony to establish that a weapon was used, (2) substantial evidence the defendant participated in the crime, and (3) testimony that the weapon admitted was similar to the one used during the crime. *People v. McCasle*, 35 Ill. 2d 552, 559 (1966).

¶ 39 In many cases, evidence related to a weapon creates the potential for prejudicial inferences that would exceed any legitimate purpose for its admission. *People v. Evans*, 373 Ill. App. 3d 948, 960 (2007). Evidence of an unrelated weapon may be unduly prejudicial where, for example, it leads to an incorrect inference that the weapon was the weapon used in the offense. See *People v. Prentiss Jackson*, 195 Ill. App. 3d 104, 112 (1990) (explaining that evidence of a weapon properly allows a jury to draw such an inference when there is evidence connecting the weapon to the crime). "The rule is universal that the evidence in a trial must be confined to the question at issue, and the test of admissibility is the connection of the evidence offered with the offense charged." *People v. Smith*, 413 Ill. 218, 222-23 (1952).

15

¶ 40    Despite the potential for prejudice, however, even the erroneous admission of weapons evidence is often found to be harmless error. The potential for prejudice from such evidence is greatly mitigated where other evidence makes it clear that the weapon was not used in the crime and is also reduced when the weapon is not displayed in trial. Further, if the improper references to a weapon play a nominal role in the trial, this, too, will limit the potentially prejudicial effect. Moreover, as with any other claimed error, admission of weapon testimony will be deemed harmless where the evidence of the defendant's guilt is overwhelming. See *Evans*, 373 Ill. App. 3d at 960-61.

¶ 41    Considering the weapons testimony within the context of the entire trial, we find that any prejudice in this matter was minimal. The forensic expert testified that the .22-caliber pistol recovered from Grinston's residence could not have been the weapon that fired the .32-caliber bullet recovered from Harriel's autopsy. No weapon was produced at trial, and the evidence clearly established that the murder weapon was not recovered. Further, the trial court limited the testimony of Joseph concerning the weapon Joseph observed defendant's brother removing from defendant's bedroom, and such testimony could be admitted to demonstrate that the weapon was similar to the one used during the crime.

¶ 42    The only evidence indicating that defendant may have possessed numerous weapons came from defendant's own testimony. On direct examination, defendant testified that he had loaned a .22-caliber pistol to Grinston. On cross-examination without objection, defendant testified that Grinston had loaned him "a .44 magnum, a .357, a .38 snub nose, .22 calibers, .380." "It is well-established that a defendant cannot complain when, on cross-

16

examination, the prosecution pursues a line of inquiry which he initiates." *People v. Clark*, 9 Ill. App. 3d 998, 1003 (1973). Since defendant, in his direct testimony, touched on weapons being loaned between him and Grinston, defendant cannot now claim that such testimony was prejudicial.

¶ 43　The testimonies concerning the .22-caliber pistol expressly established that it was not in defendant's possession and that it was not the weapon used in the crime. Further, no weapon was produced at trial, making the potential for prejudice from weapons evidence greatly mitigated. We therefore conclude that, even assuming evidence of weapons not connected to defendant or the death of Harriel was admitted in error, any error was harmless.

¶ 44　Further, to obtain relief under the second prong of the plain-error doctrine, "defendant must demonstrate not only that a clear or obvious error occurred [citation], but that the error was a structural error." *People v. Eppinger*, 2013 IL 114121, ¶ 19. A structural error is a systemic error which undermines the fairness of defendant's trial and serves to erode the integrity of the judicial process. *People v. Thompson*, 238 Ill. 2d 598, 614 (2010). An error has only been recognized as a structural error by our supreme court in a limited class of cases, including *inter alia*, racial discrimination in the selection of a grand jury, denial of self-representation at trial, denial of a public trial, and a defective reasonable doubt instruction. *Id.* at 609. Defendant makes no argument that the admission of the weapon evidence falls within the class of cases constituting a structural error.

¶ 45　As stated previously, where the evidence is close, the defendant must prove prejudicial error. In this matter, assuming *arguendo* that the evidence was closely balanced,

17

because we have determined that any error in the admittance of the weapon testimony was harmless error, defendant has failed to demonstrate a prejudicial error that threatened to tip the scales of justice against him. Further, defendant has failed to establish a structural error so serious that it affected the fairness of the defendant's trial and challenged the integrity of the judicial process. Accordingly, defendant has failed to meet his burden of persuasion.

¶ 46    Based on the above, the trial court's admission of weapons testimony not connected to defendant or the death of Harriel did not constitute plain error.

¶ 47                    B. Ineffective Assistance of Counsel

¶ 48    The next issue on appeal is whether defendant's *pro se* posttrial allegations of ineffective assistance of counsel showed possible neglect by defense counsel. Defendant asserts that the trial court committed three errors in conducting the *Krankel* hearing. First, defendant argues that the trial court did not follow the proper procedure for a preliminary *Krankel* hearing. Second, defendant states that the trial court erred in deciding the merits of defendant's claim of ineffective assistance of counsel. Third, defendant alleges that the trial court erred in not appointing counsel after defendant's allegations showed possible neglect by trial counsel.

¶ 49    When a defendant raises a *pro se* claim of ineffective assistance of counsel, the trial court "must inquire adequately into the claim and, under certain circumstances, must appoint new counsel to argue the claim." *People v. Skillom*, 2017 IL App (2d) 150681, ¶ 25. However, the trial court is not always required to appoint new counsel or hold a full evidentiary hearing on a defendant's *pro se* posttrial claim that his counsel was ineffective. *People v. Crutchfield*, 2015 IL App (5th) 120371, ¶ 24. The trial court must first conduct a

18

preliminary inquiry into the factual and legal basis of defendant's claims to determine whether the claims lack merit. *People v. Roddis*, 2020 IL 124352, ¶ 61. The trial court must consider the merits of a defendant's *pro se* posttrial claims in their entirety even in a preliminary *Krankel* inquiry. *Id.* If, after conducting this inquiry, the court determines that the defendant's claims lack merit or relate solely to matters of trial strategy, the court may deny the defendant's *pro se* motion without appointing new counsel or holding further proceedings. *People v. Moore*, 207 Ill. 2d 68, 78 (2003). If, however, the court finds that the defendant has shown possible neglect of his case by counsel, the court should appoint a new attorney to represent the defendant at a hearing on those claims. *Id*.

¶ 50    The procedure to be followed at a preliminary *Krankel* inquiry "is somewhat flexible." *People v. Fields*, 2013 IL App (2d) 120945, ¶ 40. It is appropriate for the trial court to consider its own knowledge of counsel's performance during the trial. It is also appropriate—and in most cases necessary—for the court to discuss the allegations with the defendant and to ask questions of trial counsel. *Id.* ¶ 39. However, the State should not be "an active participant during the preliminary inquiry." *Id.* ¶ 40. Our supreme court has held that the State's participation at a preliminary *Krankel* proceeding, if any, be "*de minimis*." *People v. Jolly*, 2014 IL 117142, ¶ 38.

¶ 51    "The trial court, most familiar with the proceedings at issue, remains best situated to serve the interests of judicial economy by extinguishing conclusory claims." *Roddis*, 2020 IL 124352, ¶ 56. We will not overturn the trial court's determination that a defendant's claims do not require the appointment of new counsel unless that determination is manifestly erroneous. *Crutchfield*, 2015 IL App (5th) 120371, ¶ 20. However, we review

*de novo* questions concerning the manner in which the preliminary *Krankel* inquiry was conducted. *Skillom*, 2017 IL App (2d) 150681, ¶ 25.

¶ 52    Defendant challenges the manner in which the trial court conducted the preliminary *Krankel* hearing, arguing that the trial court was unaware of the "law regarding preliminary *Krankel* inquires" because it allowed the State an opportunity to participate in the hearing. We disagree. The State's participation in a preliminary *Krankel* proceedings is limited by the nature of those proceedings. As our supreme court explained in *Jolly*, the purpose of the preliminary inquiry is to enable the court to create "an objective record for review" of the defendant's claims "and thus potentially limit issues on appeal." *Jolly*, 2014 IL 117142, ¶¶ 38-39. While the goal of creating an objective record for review is thwarted if the State is permitted to turn the inquiry into an adversarial proceeding, the State is not banned from all participation at a preliminary *Krankel* hearing—only from an adversarial role against a *pro se* defendant. *Id.* ¶ 38.

¶ 53    In this case, the State took no role in the preliminary *Krankel* hearing, citing *Jolly* as the reason for declining participation. As such, there is nothing in the record to indicate the extent that the trial court may have allowed the State's participation or that the trial court would have permitted more than *de minimis* participation by the State. Therefore, defendant's argument that the trial court's inquiry on whether the State had anything to add was an indication that the trial court was not aware of the laws governing a preliminary *Krankel* hearing is unfounded and without merit.

¶ 54    Next, defendant's argument that the trial court erred in considering the merits of defendant's *pro se* claims of ineffective assistance of counsel, although made in good faith

20

at the time of filing, is no longer applicable. In his appellant brief, defendant cited to *People v. Roddis*, 2018 IL App (4th) 170605, ¶ 81, which held "that a trial court commits reversible error when it conducts a *Krankel* hearing and concludes—on the merits—that there was no ineffective assistance, and we note that we are not the first court to so conclude." However, our supreme court recently reversed that finding in *People v. Roddis*, 2020 IL 124352, and held "that a trial court may consider both the facts and the legal merits of a defendant's *pro se* posttrial allegations of ineffective assistance of counsel at the preliminary inquiry stage." *Id.* ¶ 70. As such, defendant's argument that the trial court committed reversible error when it resolved defendant's claims on the merits is no longer germane.

¶ 55     Finally, defendant argues that the trial court erred in not appointing counsel after defendant's allegations showed possible neglect by defense counsel. We have examined the transcript of the posttrial proceeding and find that defendant's allegation that defense counsel's failure to allow defendant to review the discovery DVDs of potential witnesses, and thereby fully participate in his defense, showed possible neglect.

¶ 56     At the preliminary *Krankel* hearing, defendant informed the trial court that he was able to assist his defense counsel in the questioning of a material witness based on the information he obtained from viewing a DVD that he had reviewed with his previous counsel. Defendant stated that he may have had other opportunities to assist if he had viewed all the DVDs. The trial court inquired whether defendant had asked defense counsel about the DVDs, and defendant stated, "I believe I did once or twice. I'm not 100 percent sure." The trial court, however, made no further inquiries of defendant or defendant's counsel to flesh out this allegation. The trial court could have inquired on the number of

21

DVDs or recorded statements that were in discovery or, at the very least, inquired of defense counsel whether defendant had requested to view the DVDs and/or the reasoning for defense counsel's failure to review the discovery DVDs with defendant. The only input from defendant's counsel on this issue was that he did, indeed, ask the witness the question that defendant had raised concerning the credibility of the witness's testimony. As such, defense counsel's acknowledgement that defendant was indeed able to assist in his defense based upon his viewing of the single DVD seems to indicate that defendant may have been able to give further assistance if defendant had an opportunity to view all, if any, DVDs produced in discovery.

¶ 57 We are not aware, since the trial court did not inquire, whether any additional DVDs exist or whether defense counsel took an alternative means of reviewing the discovery with defendant, such as reviewing transcripts or written statements. Therefore, we find insufficient information in the record to support that the trial court considered defendant's *pro se* posttrial claim regarding discovery in its entirety at the preliminary *Krankel* inquiry. Further, since defense counsel's conduct concerning discovery occurred outside of the courtroom, the trial court could not rely on its own observation of defense counsel's performance in evaluating defendant's claim.

¶ 58 We find that defendant's *pro se* allegations of ineffective assistance of counsel concerning the review of discovery DVDs showed possible neglect, and we remand this matter to the trial court with directions to appoint defendant counsel and conduct a full *Krankel* evidentiary hearing on defendant's *pro se* posttrial claims of ineffective assistance of counsel.

¶ 59                                C. Sentence

¶ 60    The final issue defendant raises on appeal is whether the trial court imposed an excessive sentence. At the sentencing hearing, the State presented, *inter alia*, that defendant had a pending charge for solicitation of murder. Defendant argues that pending charges may not be utilized in aggravation during sentencing. The State also indicated that defendant had six arrests for adult misdemeanors, although only two of those arrests resulted in misdemeanor convictions, and it is defendant's position that the trial court improperly considered the six misdemeanor arrests in aggravation during sentencing.

¶ 61    Defendant further argues that the trial court improperly considered defendant's remorselessness, because no evidence of remorselessness was presented at the trial or during the sentencing hearing. Defendant maintains that he denied his involvement in Harriel's death at trial and did not make a statement in allocution, making the trial court's finding of remorselessness unsupported.

¶ 62    Finally, defendant argues that he received a sentence of 50 years' incarceration when he was only 21 years old with a minimal criminal history and strong family support. Defendant states that he withdrew from high school but later obtained his GED and enrolled in four semesters at a community college. As such, defendant argues that the trial court did not consider his youth or rehabilitation potential.

¶ 63    Trial courts enjoy broad discretion in determining the appropriate sentence to impose. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). This is because the trial judge, who had the opportunity to observe the defendant, is in a better position than we are to weigh the relevant factors. *Id*. at 213. We will not set aside a defendant's sentence on appeal

23

unless it constitutes an abuse of discretion. *Id.* at 212. A sentence that is within the statutory range for the offense is presumptively appropriate. Therefore, we will not overturn a sentence within that range unless it is "greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense." *People v. Fern*, 189 Ill. 2d 48, 54 (1999). Although this standard is highly deferential, the court's discretion is not unlimited. *People v. Busse*, 2016 IL App (1st) 142941, ¶ 27.

¶ 64 In determining an appropriate sentence, the trial court is required to consider all pertinent factors in mitigation and aggravation. *Id.* ¶ 22. The trial court is not required to specify which factors it finds relevant or how much weight it assigns to each factor. *People v. Perkins*, 408 Ill. App. 3d 752, 763 (2011). Although the court must consider any mitigating factors that are present, it is not required to weigh such factors more heavily than it weighs aggravating factors, such as the seriousness of the crime. See *People v. Weiser*, 2013 IL App (5th) 120055, ¶ 32. Indeed, the seriousness of the crime is the most important factor for the court to consider. *Busse*, 2016 IL App (1st) 142941, ¶ 28. However, penalties must also be determined with the objective of restoring the offender to useful citizenship. *People v. Clemons*, 2012 IL 107821, ¶ 37.

¶ 65 In this case, defendant was convicted of first degree murder. The statutory range for first degree murder is 20 to 60 years' imprisonment. 730 ILCS 5/5-4.5-20(a) (West 2016). Where the death resulted from the use of a firearm, the statutory sentencing range of incarceration becomes 45 years to natural life. *Id.* § 5-8-1(a)(1)(d)(iii). The trial court determined that defendant had discharged a firearm that had caused the death of another

24

person during the commission of first degree murder, making defendant subject to the statutory sentence range of 45 years' to natural life.

¶ 66    The trial court imposed a sentence of 50 years' incarceration. The sentence was not only within the statutory range for the offense, but extremely close to the minimum sentence that the trial court could have imposed. Since defendant's sentence is within the statutory range, the sentence is presumptively appropriate, and defendant has not presented any argument that would counter that presumption.

¶ 67    Defendant had an opportunity to offer mitigating factors beyond those contained in the presentence investigation report (PSI), including factors related to defendant's rehabilitation potential, but declined. A trial court is required to consider all pertinent factors in mitigation, but we cannot fault the trial court for not considering factors unavailable for its consideration. The record indicates that the trial court considered defendant's PSI in sentencing, and the PSI provided defendant's age, education, and family information. Further, defense counsel argued defendant's age in support of a minimum sentence. The trial court is not required to specify which factors it finds relevant or how much weight it assigns to each factor, and there is no indication in the record that the trial court failed to consider defendant's age and rehabilitation potential.

¶ 68    Also, defendant's argument that the trial court relied on unproven criminal conduct is without merit. Defendant argues that the trial court gave "unknown weight" to defendant's pending solicitation of murder charge and considered six arrests for adult misdemeanors although only two of those cases resulted in misdemeanor convictions. The six arrests for adult misdemeanors were not argued by the State at the sentencing hearing

but were contained in the PSI. The trial court specifically inquired whether defendant had an opportunity to review the PSI with his counsel, and defendant acknowledged that he had reviewed the PSI prior to the sentencing hearing. Defendant was also given an opportunity to inform the court whether there were any "corrections, deletions, amendments" needed to the PSI, and defendant indicated there were not. Defendant would be in the best position to know his prior criminal history and inform the trial court of any misinformation, but instead, defendant confirmed that the information contained in the PSI was correct. Further, the State did not argue that defendant had a pending solicitation of murder charge. Instead, the State stated that defendant "did not hesitate to plot another murder of somebody so close to him," which was part of the testimony presented at trial.

¶ 69    Finally, concerning defendant's argument that the trial court had no evidence of defendant's remorselessness and therefore should not have considered it, the State pointed to testimony regarding defendant's response when he was informed of Harriel's death and defendant's failure to contact the victim's family with whom he allegedly had a close relationship as evidence of defendant's remorselessness at the sentencing hearing. As such, the trial court's comment that defendant showed "no remorse" was supported by some evidence.

¶ 70    The seriousness of the crime is one of the most important factors for the court to consider in sentencing. In this case, defendant was convicted of shooting Harriel in the head and leaving him in the middle of a street. The trial court, after considering "the factual basis, the presentencing investigation, the history, character and attitude of the defendant, the evidence and arguments presented, and having considered the matters in aggravation

and mitigation," noted that "a cold-blooded murder was committed" and sentenced defendant to 50 years' incarceration.

¶ 71     Defendant's sentence was within the statutory range for first degree murder and was close to the minimum sentence that the trial court could have imposed. The trial court afforded defendant an opportunity to offer mitigating factors, and defendant declined to offer any evidence in mitigation. Defendant also failed to inform the trial court of any incorrect information pertaining to his criminal history contained in the PSI. The trial court considered the available factors in aggravation and mitigation and further considered the seriousness of the crime for which defendant was convicted. Based on the foregoing, we find that defendant's sentence is not excessive.

¶ 72                                    III. CONCLUSION

¶ 73     For the foregoing reasons, we affirm defendant's conviction and sentence but remand for further *Krankel* proceedings.

¶ 74     Affirmed and remanded.