2025 IL App (4th) 230523

NO. 4-23-0523

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
April 24, 2025
Carla Bender
4th District Appellate
Court, IL

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the |
| Plaintiff-Appellee, | ) Circuit Court of |
| v. | ) Winnebago County. |
| MATTHEW STEVEN HARKEY, | ) No. 19CF633 |
| Defendant-Appellant. | ) |
| | ) Honorable |
| | ) Joseph G. McGraw, |
| | ) Judge Presiding. |

JUSTICE STEIGMANN delivered the judgment of the court, with opinion.
Presiding Justice Harris and Justice DeArmond concurred in the judgment and
opinion.

## OPINION

¶ 1 In April 2022, a jury convicted defendant, Matthew Steven Harkey, of four counts
of aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(2) (West 2018)), four counts of
criminal sexual assault (*id.* § 11-1.20(a)(1)), one count of aggravated kidnapping (*id.* § 10-2(a)(6)),
one count of home invasion (*id.* § 19-6(a)(2)), and one count of aggravated criminal sexual abuse
(*id.* § 11-1.60(a)(2)).

¶ 2 After trial but before sentencing, defendant *pro se* filed a motion for a new trial,
alleging his trial counsel rendered ineffective assistance. At a hearing on the motion, the trial court
granted defendant's request for a continuance to speak with his trial counsel. Subsequently, the
trial court granted two continuances for defendant to hire private counsel, but defendant was unable
to do so.

¶ 3 In August 2022, at a continued hearing on defendant's *pro se* posttrial motion, the

trial court appointed the public defender's office to represent defendant and entered an order stating that (1) "defendant wishe[d] to pursue his motion for ineffectiveness of trial counsel" and (2) "[t]he defendants a [*sic*] *pro se* motion or [*sic*] will be reviewed."

¶ 4 In January 2023, new counsel filed an amended posttrial motion, arguing, among other things, that trial counsel was ineffective. In March 2023, the trial court conducted a hearing on the amended motion and denied it.

¶ 5 In April 2023, the trial court sentenced defendant to an aggregate term of 123 years in prison.

¶ 6 Defendant appeals, arguing only that after "defendant filed a *pro se* post-trial motion raising allegations of ineffective assistance by his trial counsel, the trial judge erred when he appointed new counsel to represent the defendant without conducting an inquiry into the claims pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984)." We emphatically disagree and affirm.

¶ 7                                                    I. BACKGROUND

¶ 8                               A. The Charges and Pretrial Proceedings

¶ 9 In July 2020, the State charged defendant, by superseding indictment, with 28 offenses, all stemming from defendant's conduct against the victim, A.W., on March 13, 2019. The charges generally alleged that defendant entered A.W.'s home, without authority and while A.W. was present, and physically attacked her, eventually rendering her unconscious. Defendant then restrained A.W. with handcuffs and duct tape, placed her in the trunk of her car, and took her to his mother's house, where he repeatedly sexually assaulted her. Some of the charges alleged that defendant committed certain offenses while armed with a firearm.

¶ 10 The State later voluntarily dismissed 14 of the charges and amended 4 others. As a result, in April 2022, the case proceeded to a jury trial on the following offenses: four counts of

aggravated criminal sexual assault (720 ILCS 5/11-1.30(a)(2) (West 2018)), four counts of criminal sexual assault (*id.* § 11-1.20(a)(1)), one count of aggravated kidnapping (*id.* § 10-2(a)(6)), two counts of home invasion (*id.* § 19-6(a)(2)), and one count of aggravated criminal sexual abuse (*id.* § 11-1.60(a)(2)).

¶ 11       During pretrial proceedings, defendant was represented by multiple private attorneys. The case involved a large amount of DNA testing and pretrial discovery, which resulted in significant delay. In May 2020, Glen Jazwiec entered his appearance as defendant's counsel and represented defendant at his April 2022 jury trial.

¶ 12                                    B. The Jury Trial

¶ 13       In April 2022, the trial court conducted defendant's jury trial, which lasted five days. The evidence at trial showed the following.

¶ 14                              1. *The State's Evidence*

¶ 15       A.W. was a massage therapist, and defendant began seeing her as a client about two or three years before the events of March 13, 2019. A.W. lived in an apartment in Rockford, Illinois, that defendant had helped her find. Defendant had also bought her a car and got her a job at the car dealership where he worked. A.W. testified that in the fall of 2018, the relationship "became sexual" on one occasion in which she engaged in oral sex with defendant. She ended the relationship in November or December 2018 and was no longer speaking to defendant by March of 2019.

¶ 16       On March 13, 2019, A.W. returned home after dropping her children off at school. When she entered the home, she was struck on the head with what she thought was a clear glass bottle. She then struggled with the assailant, who put her in a headlock and choked her until she lost consciousness. When she awoke, she was on the floor with her hands handcuffed behind her

back and a ski mask taped over her head and eyes. The assailant was duct-taping her legs together. She was taken to the garage and thrown into the trunk of her car.

¶ 17          A.W. tried to remove her bindings and escape but was unsuccessful. When the car stopped and the trunk opened, the ski mask over her head had moved enough to allow her to see. She saw defendant standing over her, and he dragged her from the trunk into a house that she recognized as defendant's mother's home. Defendant dragged A.W. into the basement and into a room containing weightlifting equipment. Defendant put A.W. on a weight bench, handcuffed her to it, and then used rachet straps to further tie her down. Defendant then penetrated her vaginally and orally.

¶ 18          At some point, she heard defendant leave. A.W. fought against her restraints and was eventually able to free herself from the rachet straps and made it upstairs, dragging the weight bench with her. A.W. made it out the front door and into the front yard, where she began screaming for help. A.W. was naked, bleeding, and still dragging the weight bench when a neighbor approached her, wrapped her in a blanket, and called the police. DNA testing from a sexual assault kit revealed defendant's DNA from various swabs of A.W.'s body.

¶ 19          The parties stipulated that defendant had rented a silver SUV the day before. Police officers testified that when they attempted to stop the rented vehicle, defendant fled at a high speed. Defendant fled through several counties and eventually crashed the SUV in Piatt County.

¶ 20          Inside the SUV, the police located a bag belonging to A.W., her wallet, car keys, and soiled clothing. They also found duct tape, bloody paper towels, and various items belonging to defendant.

¶ 21          Several months after March 2019, defendant's sister dropped off at the sheriff's department a bag containing a handgun wrapped in a yellow towel. Experts tested the gun for DNA

and located A.W.'s DNA on it. They further identified defendant as a likely contributor of other DNA found on the gun.

¶ 22　　　　　The State introduced recordings of three phone calls that defendant made from jail after his arrest. All three calls were to the same woman. In one call, he told the woman that "mom" would be home soon and asked her to retrieve an item next to a yellow towel. In a later call, the woman confirmed that she got the item and wrapped it in the yellow towel.

¶ 23　　　　　When the State rested, the trial court granted defendant's motion for a directed verdict only as to one count, which was aggravated kidnapping predicated on defendant's concealing himself by a mask, hood, or robe.

¶ 24　　　　　　　　　　2. *Defendant's Evidence*

¶ 25　　　　　Defendant testified that he began getting massages from A.W. in 2016 or 2017 for back pain. In 2018, they became friends, and in the fall of 2018, they began dating. Defendant testified they had sex on five occasions. The relationship faded in the winter of 2018, and A.W. did not talk to him at all in January and February 2019.

¶ 26　　　　　Defendant admitted that he went to A.W.'s house in March 2019 in a rented car but stated he was there because (1) she had recently contacted him and (2) he was returning some of her belongings. Defendant testified that he rented the car to take a vacation to Kansas for a week and the return date on the rental agreement was wrong.

¶ 27　　　　　When A.W. returned home and pulled her car into her garage, defendant decided to surprise her, as he claimed he often did while they were dating, and followed behind her. In the living room, defendant yelled, "Boo!" to scare her. Defendant testified that A.W. slapped him and began to hit him, gouge his eyes, and kick his groin. Defendant struggled with her and put her in a "sleeper hold" until she lost consciousness.

¶ 28         According to defendant, while A.W. was unconscious, he grabbed handcuffs from A.W.'s "sex bag" and handcuffed her arms behind her back to prevent her from attacking him again. Defendant cleaned up blood from himself and A.W. When A.W. woke up, he explained he was dropping things off but had to go to his mother's house to take care of some plants and offered to take A.W. with him so they could talk. Defendant pointed out that A.W. had "soiled [her]self" and she would have to ride in the trunk, which she agreed to do.

¶ 29         On cross-examination, defendant explained that his mother spent the winter in Myrtle Beach, South Carolina, so her house was empty and some of her utilities, including the water, were temporarily shut off. Defendant stated that he took A.W. to the basement because he thought it would be a good place to clean her off. Defendant testified that he was still afraid that A.W. might attack him, so he handcuffed her to a weight bench while he cleaned her off. A.W. then offered to perform oral sex on him. Defendant further testified that he then engaged in consensual oral and vaginal intercourse with A.W. on the weight bench. He explained that he got rachet straps to tie her to the bench because it "wasn't working because of the way the bench was."

¶ 30         When defendant noticed that A.W. had been cut by the handcuffs, he went upstairs to get antiseptic and gauze to dress her wound. When he could not find any, he left in A.W.'s car to go to a pharmacy. Defendant testified that his "brain was in zombie mode" and he drove around for several minutes before noticing emergency vehicles drive past him toward his mother's house. Realizing the police would "immediately think that [he] attacked [A.W.]," defendant dropped off A.W.'s car, got into his rental vehicle, and fled.

¶ 31                              3. *The Jury's Verdict*

¶ 32         The jury found defendant not guilty of home invasion predicated on entering A.W.'s home while armed with a firearm but guilty of the remaining 11 counts—namely, 4 counts

of aggravated criminal sexual assault; 4 counts of criminal sexual assault; 1 count of home invasion, causing bodily harm; 1 count of aggravated kidnapping while armed with a firearm; and 1 count of aggravated criminal sexual abuse.

¶ 33                                    C. The Posttrial Proceedings

¶ 34                                    1. *Defendant's Posttrial Motions*

¶ 35            In May 2022, defendant *pro se* filed a motion for a new trial, asserting that his trial counsel rendered ineffective assistance because counsel "did not properly prepare for his defense." Specifically, defendant alleged the following:

> "Couns[e]l NEVER gave a copy of the discovery to the defendant nor went over any of the details of it with the defendant so he could not help with his own defense or prepare to defend himself against these charges brought against him.
>
> He did not investigate any part of the case.
>
> Did not subp[o]ena any evidence asked by the defendant.
>
> Did not submit any evidence given to him by the defendant.
>
> Did not subp[o]ena any witnesses that the defendant wanted him to.
>
> Did not call any defense witnesses to the stand as directed by the defendant.
>
> Was not prepared to ask witnesses questions nor wanted to ask the questions the defendant wanted asked including the supposed victim in this case.
>
> Did not want the defendant to mention certain details when questioned on the stand that the defendant wanted to mention and felt the jury should have known about.
>
> Did not REDIRECT question the defendant on the stand in order to correct questions asked by the State that there was more details and information that the

- 7 -

jury should have heard."

¶ 36 Later in May 2022, trial counsel, Jazwiec, filed a posttrial motion seeking a judgment notwithstanding the verdict or, in the alternative, a new trial. In Jazwiec's posttrial motion, he argued that (1) the State failed to present sufficient evidence to prove defendant guilty of each of the offenses and (2) the trial court erred by admitting into evidence the gun, certain photos of the gun, and testimony related to the gun and those photos.

¶ 37 2. *The Initial Hearing on Defendant's Pro Se Motion*

¶ 38 On June 10, 2022, the trial court conducted a hearing on defendant's posttrial motions, and the following exchange occurred:

"THE COURT: All right. Procedurally there are several directions we could go this morning. It's set for sentencing and motion for new trial. [Defendant] has also filed a motion alleging ineffective assistance of counsel.

Have you talked to your client about that motion?

MR. JAZWIEC: He's filed the motion, Judge. Actually I had talked to him about the motion that I filed and then after that I found out that he had filed this motion.

THE COURT: All right. [Defendant], are you persisting in your motion for new trial alleging ineffective assistance on the part of Mr. Jazwiec?

THE DEFENDANT: As he—like he said, I haven't talked to him about that either so I don't know if he wants to talk to me first or not. I don't know how that works.

MR. JAZWIEC: Judge, I will talk to him about that. I—procedurally, I didn't know whether or not it was appropriate for me to go and talk to him about

that, but I will. If we get a date, I will talk to [defendant] about that.

THE COURT: Okay. So here's the thing, I've got to resolve that issue one way or the other before I can proceed further. Do you understand what I'm saying?

I'm talking to you, [defendant].

THE DEFENDANT: Yes, sir.

THE COURT: Okay. I've got to resolve that issue before I can proceed further on this case. Do you understand?

THE DEFENDANT: Yes, sir.

\* \* \*

THE COURT: I'm going to set this over for June 21st at 1:30 for status on your motion alleging ineffective assistance of counsel and depending on how that goes then we may or may not proceed to the motion for a new trial and/or set a new date for sentencing. Do you understand?

THE DEFENDANT: Yes, Your Honor."

¶ 39                                3. *The Subsequent Status Hearings*

¶ 40        On June 21, 2022, the trial court conducted a hearing, and the following exchange took place:

"THE COURT: All right. I think one of the first issues to take up was [defendant's] *pro se* motion alleging ineffective assistance of counsel.

MR. JAZWIEC: That is correct, Judge. I did speak to [defendant] inside of the jail in regards to that so I'll let [defendant] speak to that.

THE COURT: All right. [Defendant], what do you want to do about that motion?

THE DEFENDANT: I apologize to the Court. I thought it was next Tuesday I had court and I have yet to speak with my mother who was trying to speak to another attorney about as far as moving forward. I didn't want to make any decisions without her. So I didn't know if I was going to get a little bit more time.

THE COURT: So what are you saying exactly? You want another week to talk to your mother or what?

THE DEFENDANT: That's what I'm asking for, yes, Your Honor.

THE COURT: About whether or not to hire another attorney or what are you talking to your mother about? What's the purpose of the delay? I'm trying to understand that.

THE DEFENDANT: To either move forward with my motion with another attorney or continue with Mr. Jazwiec himself.

* * *

THE COURT: All right. So what we're going to do then is you're going to tell me, [defendant], whether you—if you're going to get another lawyer, have him or her present so we can hear from that person about scheduling a hearing on your motion alleging ineffective assistance of counsel. If you decided not to pursue that after speaking to another attorney, I'm going to make a record of that and then we're going to set post-trial motions that are already filed by Mr. Jazwiec for a future hearing date. Do you understand?

THE DEFENDANT: Yes, I do, Your Honor."

¶ 41    In July 2022, the trial court conducted a status hearing. The court stated, "All right. You wanted time to speak to your mother about hiring another attorney or whether or not you

wanted to proceed with your motion. *** What did you decide?"

¶ 42    In response, defendant described the difficulty he was having in hiring counsel to represent him. The trial court then said it would give defendant "one more continuance to hire somebody to present your motion alleging that Mr. Jazwiec was ineffective."

¶ 43                    4. *The Trial Court Appoints New Counsel*

¶ 44    In August 2022, the trial court conducted another status hearing and heard from defendant that he was again unable to hire private counsel. When the court then inquired if defendant wished to argue his motion about ineffectiveness of counsel, defendant responded, "With a public defender I would."

¶ 45    The trial court then appointed the public defender's office "for purposes of pursuing a—assisting [defendant], in pursuing a motion for ineffective assistance of counsel" by Jazwiec.

¶ 46                    5. *The Subsequent Status Hearings Involving New Counsel*

¶ 47    In September 2022, the trial court conducted a status hearing to inquire about the progress the public defender's office had made and what counsel intended to do next. Assistant Public Defender Bijan Partowazam informed the court as follows: "I've been assigned to this case. I've met with [defendant] in the jail to go over his *pro se* filing. I have requested a transcript, I made that request on August 8th, so just waiting for transcripts to come in so that I can file my own amended motion." The court continued the case for a status hearing to see "where [Mr. Partowazam was] at on terms of transcripts" and noted that "[u]pon receipt of transcripts[, Mr. Partowazam] will draft an amended motion."

¶ 48    At a November 2022 status hearing, Partowazam told the trial court that he had received the trial transcripts but needed more time to prepare his motion for a new trial. The court then continued the matter to January 2023.

¶ 49        6. *The Amended Motion for New Trial and the State's Response*

¶ 50        In January 2023, Partowazam finally filed his motion for a new trial, which raised several grounds. The amended motion, in part, alleged the following:

> "Trial counsel was ineffective for not presenting information in the trial the defendant believes was relevant to his defense, including but not limited to the following:

> a. Counsel did not subpoena and question witnesses the defendant wanted to testify including Chad Farris, the victim's landlord, about the garage door being damaged before the day of this incident among others.

> b. Counsel did not question the victim about various things she would have the defendant do for her including placing tracking devices on the vehicle of her ex-boyfriend.

> c. Trial counsel did not question the victim about any financial motivations given that a civil suit against her and the defendant's former employer was pending at the time.

> d. The State made a point of arguing in closing that the defendant was inconsistent when he testified about bringing the victim to his mother's house to clean up, but also testified that the water was off when his mother was gone for the winter. Counsel should have pointed out that it was just the main water valve in the basement that was off, and simply needed to be opened to get water running in the house."

¶ 51        In February 2023, the State filed its response in which it addressed each of defendant's four claims of ineffective assistance. The State argued that defendant failed to provide

any details about the evidence or testimony that should have been presented and how the failure to present that evidence prejudiced him. The State emphasized that (1) the evidence of defendant's guilt was overwhelming and (2) defendant's complaints all related to matters of trial strategy, including which witnesses to call and what questions to ask on cross-examination.

¶ 52                    7. *The Hearing on Defendant's Amended Posttrial Motion*

*and the Trial Court's Ruling*

¶ 53        In March 2023, the trial court conducted a hearing on Partowazam's amended posttrial motion. Partowazam began by arguing the ineffective assistance claims in the amended motion. He asserted that the State claimed during trial that "defendant had somehow tampered with the garage door and that's what led to his gaining access, but Chad Farris would have been able to testify that the damage was already preexisting."

¶ 54        Regarding the failure to cross-examine A.W., Partowazam explained that defendant believed testimony about how A.W. had defendant put tracking devices on her ex-boyfriend's vehicles would have been "important to show the jury *** that there were other people that could have committed these crimes." Partowazam further explained that Jazwiec was ineffective for failing to cross-examine A.W. about a lawsuit she filed against a car dealership that formerly employed her and defendant. That lawsuit involved claims of sexual harassment by defendant. Partowazam contended that had the lawsuit been explored at trial, the jury would have learned that A.W. had a financial motivation "to allege things to further her case."

¶ 55        Finally, Partowazam argued that the State "did make a point in closing about water being shut off to [defendant's] mother's house" and trial counsel should have responded that the water service was still active and could easily have been turned on. Partowazam stated, "So those are things that [defendant] believes should have been presented to the jury because they would

have furthered his defense and so it would have been ineffective on the part of trial counsel to not bring those things to the jury's attention."

¶ 56　　　　The State responded at length to each assertion of ineffective assistance, arguing that defendant had failed to demonstrate prejudice by explaining how the outcome would have been different. The State also argued that trial counsel had strategic reasons for not impeaching A.W. at trial.

¶ 57　　　　The trial court denied Partowazam's amended motion, explaining, in part, as follows:

"[Because] I was the trial judge, I have my own independent recollection of the evidence as it came in. ***

*** I find that Mr. Jazwiec's trial strategy decisions were reasonable decisions. I do not find that he deviated below acceptable standards or reasonable standards. I do not find that his decisions prejudiced you. Everything that you're suggesting that could have been done, there's an argument as to why it wasn't done, or it requires me to speculate on why it wasn't done. So when I look at everything in this case, the arguments of counsel, all the evidence, the testimony, the credibility of the witnesses, the things that you, yourself said on the witness stand, you know, essentially confessing to portions, if not major portions of the, of the crime or crimes for which you were convicted ***. So this motion for new trial is not well taken. It's denied in every respect for the reasons stated on the record."

¶ 58　　　　　　　　　　D. The Sentencing Hearing

¶ 59　　　　In April 2023, the trial court conducted defendant's sentencing hearing and sentenced him to an aggregate term of 123 years in prison. The court found that the criminal sexual

- 14 -

assault convictions were lesser included offenses of the aggravated criminal sexual assault convictions and merged into those convictions. The court further found that (1) all sentences were subject to mandatory consecutive sentencing and (2) the aggravated kidnapping offense was subject to a 15-year firearm enhancement.

¶ 60    This appeal followed.

¶ 61                                II. ANALYSIS

¶ 62    Defendant appeals, arguing only that after "defendant filed a *pro se* post-trial motion raising allegations of ineffective assistance by his trial counsel, the trial judge erred when he appointed new counsel to represent the defendant without conducting an inquiry into the claims pursuant to *People v. Krankel*, 102 Ill. 2d 181 (1984)." We emphatically disagree and affirm.

¶ 63                            A. Defendant's Arguments

¶ 64    Defendant argues that the trial court erroneously appointed new counsel to represent him without conducting an inquiry to determine whether any of his *pro se* claims of ineffective assistance of trial counsel showed the possibility of neglect. He claims that the Illinois Supreme Court has made clear that *People v. Krankel*, 102 Ill. 2d 181 (1984), requires a trial court to conduct an adequate inquiry into the bases of a defendant's *pro se* claims before determining whether to appoint new counsel. Defendant also contends that remand for a *Krankel* inquiry is necessary so (1) the trial court can evaluate the *pro se* claims, weeding out the meritless claims from those showing possible neglect, and (2) new counsel will be aware of his "distinctive role" to evaluate the potentially meritorious claims.

¶ 65    We reject all of defendant's contentions because they rest on a fundamental misunderstanding of the purpose of a *Krankel* inquiry and the relief that such a proceeding provides.

¶ 66                                    B. *Krankel* Proceedings

¶ 67                                    1. *The* Krankel *Inquiry*

¶ 68            A defendant is not automatically entitled to appointed counsel when he files *pro se* a motion asserting ineffective assistance of counsel. *People v. Ayres*, 2017 IL 120071, ¶ 11. "Rather, '[t]he law requires the trial court to conduct some type of inquiry [*i.e.*, a *Krankel* inquiry] into the underlying factual basis, if any, of a defendant's *pro se* posttrial claim of ineffective assistance of counsel.' " *Id.* (quoting *People v. Moore*, 207 Ill. 2d 68, 79 (2003)). "If the trial court determines that the claim lacks merit or pertains only to matters of trial strategy, then the court need not appoint new counsel and may deny the *pro se* motion. However, if the allegations show possible neglect of the case, new counsel should be appointed." (Internal quotation marks omitted.) *Id.*

        "New counsel would then represent the defendant at the hearing on the *pro se* ineffective assistance of counsel claim. Appointed counsel can independently evaluate the claim and avoid the conflict of interest that trial counsel would have in trying to justify his or her own actions contrary to the defendant's position." *People v. Roddis*, 2020 IL 124352, ¶ 36.

¶ 69            "[T]he primary purpose of the preliminary [*Krankel*] inquiry is to give the defendant an opportunity to flesh out his claim of ineffective assistance so the court can determine whether appointment of new counsel is necessary." *Ayres*, 2017 IL 120071, ¶ 20. To achieve this goal, the trial court usually asks the defendant about his claims. *Id.* ¶ 12. In addition, "some interchange between the trial court and trial counsel regarding the facts and circumstances surrounding the allegedly ineffective representation is permissible and usually necessary in assessing what further action, if any, is warranted on a defendant's claim." (Internal quotation

marks omitted.) *Id.* Accordingly, the trial court may ask the defendant's trial counsel to comment on the defendant's allegations. *Id.* The court may also rely upon "its knowledge of defense counsel's performance at trial and the insufficiency of the defendant's allegations." *Id.* However, the State is not permitted to participate in a *Krankel* inquiry. See *People v. Jolly*, 2014 IL 117142, ¶ 38.

¶ 70                    2. *The Narrow Purpose of a* Krankel *Inquiry*

¶ 71            The common law procedure first recognized in *Krankel* "serves the narrow purpose of allowing the trial court to decide *whether to appoint independent counsel* to argue a defendant's *pro se* posttrial ineffective assistance claims." (Emphasis added.) *People v. Patrick*, 2011 IL 111666, ¶ 39. Thus, "a *Krankel* hearing is a term of art to describe the hearing the court must conduct when a defendant *pro se* has raised a posttrial claim regarding his counsel's ineffective assistance." *People v. McGath*, 2017 IL App (4th) 150608, ¶ 51.

¶ 72            Because the *only* issue to be decided at a *Krankel* inquiry is whether new counsel should be appointed, there are only two possible outcomes when a trial court conducts a *Krankel* inquiry: (1) the court appoints new counsel who should then conduct an independent evaluation of the defendant's ineffective assistance claims and take whatever action counsel thinks would be appropriate or (2) the court does not appoint new counsel and posttrial matters proceed as in any other case. Accordingly, at a *Krankel* inquiry, the trial court considers the merits of a defendant's ineffective assistance claims in the context of deciding whether the court should appoint new counsel for the defendant to investigate such claims.

¶ 73            The "preliminary inquiry" to which *Krankel* cases sometimes refer is the trial court's inquiry into the factual and legal basis, if any, of a defendant's posttrial claims of ineffective assistance of his trial counsel. *Roddis*, 2020 IL 124352, ¶¶ 55, 61. The court conducts

this inquiry to determine whether appointing new counsel to pursue those claims is appropriate. *Id.* ¶ 61. However, there is no true "second stage" to a *Krankel* inquiry because the *sole* issue to be resolved at a *Krankel* inquiry is whether new counsel should be appointed. *Patrick*, 2011 IL 111666, ¶ 39.

¶ 74 The narrow purpose of a *Krankel* inquiry becomes clear when contrasted with the situation in which a defendant *hires* new counsel, who then files a posttrial motion alleging ineffective assistance of the defendant's original trial counsel. In that instance, no *Krankel* inquiry is necessary because the defendant is already represented by independent counsel who (1) has investigated the defendant's claims of ineffective assistance of trial counsel and (2) determined that it was appropriate to file a motion for a new trial based upon a claim that defendant's trial counsel was ineffective. When such a motion is filed, trial courts routinely conduct hearings thereon at which both the defendant and the State fully participate.

¶ 75 No *Krankel* inquiry is necessary in this situation because the defendant already has new counsel to independently evaluate and pursue the defendant's ineffective assistance claims. When the defendant already has hired new counsel for that purpose, the question of whether the court need appoint counsel to pursue those claims simply does not exist. See *People v. Wilson*, 2024 IL App (4th) 231281-U, ¶ 31 (noting that the "defendant received the same benefit he could have received if the court had conducted a preliminary *Krankel* inquiry and determined his allegations showed possible neglect of his case by [trial counsel]—the appointment of new counsel to independently evaluate defendant's claims and present them to the court"); see also *People v. Downing*, 2019 IL App (1st) 170329, ¶ 59 ("In other words, the defendant received all that a preliminary *Krankel* inquiry could have given him, anyway.").

¶ 76 3. *The Role of Newly Appointed Counsel*

¶ 77        Because the *sole* issue to be resolved by a *Krankel* inquiry is whether the trial court should appoint new counsel for a defendant so that the new counsel can take whatever action (in counsel's professional judgment) that would be appropriate regarding the defendant's claim of ineffective assistance, the court should make clear to any counsel the court appoints just what counsel's role is. That role is to investigate the defendant's *pro se* claims of ineffective assistance of trial counsel—not to pursue other claims of error, like those commonly raised in posttrial motions.

¶ 78        However, new counsel's role is not limited to the claims the defendant raised *pro se* regarding his trial counsel's alleged ineffectiveness. In addition to those claims, new counsel should also consult with the defendant and review the entirety of the trial court proceedings, leading up to and including the trial (or the guilty plea) that resulted in the defendant's conviction.

¶ 79        After such a review, if new counsel concludes that, in new counsel's professional judgment, a claim that defendant's trial counsel was ineffective has merit, then new counsel should file a motion for a new trial (or a motion to withdraw the defendant's guilty plea) alleging defendant's trial counsel's ineffectiveness.

¶ 80        On the other hand, if, after such a review, new counsel concludes that, in new counsel's professional judgment, a claim that defendant's trial counsel was ineffective has no merit, then new counsel should so inform the trial court by filing a motion to withdraw.

¶ 81        Experience shows that when trial courts conduct *Krankel* inquiries and ultimately conclude that a defendant's claims of ineffectiveness of his trial counsel lack merit or pertain only to matters of trial strategy, courts usually then proceed with posttrial matters filed in due course by the defendant's trial counsel. This makes sense, given that defendant's trial counsel would be very familiar with the court's evidentiary rulings or with other possible grounds for filing a motion

for new trial.

¶ 82     In the event that new counsel (who had been appointed to investigate the defendant's ineffectiveness claims) files a motion to withdraw because new counsel has concluded that a claim that defendant's trial counsel was ineffective has no merit, we see no reason why the above usual procedure should not be followed. That is, we see no reason why defendant's original trial counsel should not then file and proceed with any posttrial motions that he or she would have filed on the defendant's behalf absent the intervening *Krankel* proceedings.

¶ 83     As a last matter regarding the role of new counsel, we reiterate what this court recently wrote in *People v. Maury*, 2025 IL App (4th) 220887, ¶¶ 142, 157-59—namely, that new counsel must exercise his or her professional judgment regarding what claims, if any, that trial counsel was ineffective have merit. In doing so, new counsel is *not* obligated to present all of the nonfrivolous claims that the defendant contends show that his trial counsel was ineffective.

¶ 84                              C. This Case

¶ 85     Although defendant acknowledges that the trial court appointed new counsel for him at his request to pursue defendant's allegations of ineffective assistance of counsel after defendant filed a *pro se* posttrial motion raising those allegations, defendant contends nonetheless that the court erred by taking this action because the court failed to first conduct a *Krankel* inquiry.

¶ 86     This contention makes no sense.

¶ 87     Had the trial court conducted a *Krankel* inquiry, the court would have either (1) appointed new counsel to investigate defendant's ineffective assistance claims and to thereafter take whatever action counsel deemed appropriate or (2) declined to appoint counsel because the court concluded that defendant's claims lacked merit or pertained only to matters of trial strategy.

¶ 88     In this case, the trial court, based upon its review of defendant's *pro se* written

claims and its own knowledge of the proceedings leading up to the filing of those claims, decided on the former, which was precisely was defendant asked for and which inured to his benefit. Defendant has not stated how he was prejudiced by the court's granting him the relief he requested. Nor can we discern any prejudice to defendant.

¶ 89        1. *Judicial Economy and Policy Support Our Conclusion*

¶ 90        There are sound policy reasons why a trial court might choose to directly appoint new counsel to investigate a defendant's posttrial claims of ineffectiveness by his trial counsel, as happened in this case and in *People v. Boose*, 2025 IL App (4th) 231467, discussed later (*infra* ¶¶ 100-03), without first conducting a *Krankel* inquiry. For instance, the court may conclude, in the court's judgment, that a defendant's claims appear to be such that an adversarial hearing will ultimately prove necessary to resolve them. This is especially true when, as here, the court presided over the defendant's trial and pretrial proceedings.

¶ 91        Experience teaches that a defendant who has been convicted of serious crimes and faces a lengthy prison sentence, like defendant in the present case, will almost always file a postconviction petition alleging that his trial counsel was ineffective. Such petitions are typically filed (1) several years after the defendant has been convicted and (2) only after the defendant's initial direct appeal has been rejected. Thus, if a third-stage evidentiary hearing is going to be held, it will be several years later still. At that point, some important witnesses may no longer be available (or even alive) and, at a minimum, recollections of events leading up to—and including—the defendant's trial or guilty plea will likely be severely diminished. See *Ayres*, 2017 IL 120071, ¶ 21; *Downing*, 2019 IL App (1st) 170329, ¶ 41 ("[T]he whole point of *Krankel* is that we should *not* kick the can down the road." (Emphasis in original.)).

¶ 92        Contrast that situation with one, like the present case, in which only months after

defendant's jury trial, the trial court appointed new counsel to investigate defendant's claim of his trial counsel's ineffectiveness. When new counsel later filed his amended motion for a new trial and the court conducted a hearing on that motion, (1) all of the necessary witnesses were still available, (2) any physical evidence any party might have wished to use at the hearing on that motion was also still available, (3) defendant and the parties' lawyers could still recall the trial court proceedings, and (4) perhaps most important (as shown in the present case), the trial judge who presided at defendant's trial could still recall the evidence presented at trial.

¶ 93                                    2. People v. Kyles *Is Inapposite*

¶ 94            In an effort to claim defendant was somehow prejudiced when the trial court, without conducting a *Krankel* inquiry, appointed new counsel to investigate defendant's contention that his trial counsel was ineffective, defendant cites the Second District opinion in *People v. Kyles*, 2020 IL App (2d) 180087. However, that case is clearly inapposite.

¶ 95            In *Kyles*, the defendant pleaded guilty, pursuant to a plea agreement, and the trial court sentenced him to 21 years in prison. *Id.* ¶ 1. The defendant later moved *pro se* to withdraw his guilty plea and vacate the judgment, alleging in part that his attorney was ineffective. *Id.* Then, at a *Krankel* inquiry, the defendant's trial attorney "voluntarily withdrew, and the court appointed new counsel, who later moved to reconsider the sentence *but abandoned defendant's ineffective-assistance claims*. The court denied the motion, and [the] defendant appealed." (Emphasis added.) *Id.*

¶ 96            Not surprisingly, the Second District found error in the trial court proceedings because "defendant's *Krankel* counsel abandoned the ineffective-assistance claims that [the] defendant raised in his *pro se* motion but [counsel] did not move to withdraw." *Id.* ¶ 46. The Second District also made the following observations:

"[T]he only resolution of [the] defendant's *pro se* motion in this case is counsel's statement on the record, and in [the] defendant's presence, that [the] defendant had decided not to proceed on his *pro se* claims. Counsel did not indicate whether she had independently evaluated the *pro se* claims and whether she found any of them to be meritorious. Given that counsel did not move to withdraw, she very well *may* have evaluated the *pro se* claims and found some of them to be meritorious but, upon consultation with and direction from [the] defendant, declined to pursue them. On the other hand, it is possible that counsel did *not* evaluate the *pro se* claims and simply withdrew them, proceeding thereafter consistent with her appointment as new trial counsel. Because it is not clear from the record whether counsel fulfilled her duty to independently evaluate [the] defendant's *pro se* claims, we must conclude that counsel failed to act as *Krankel* counsel at all. As such, prejudice is presumed ***." (Emphases in original.) *Id.*

¶ 97 *Kyles* is clearly inapposite because, in the case before us, the trial court, when it appointed the public defender as new counsel for defendant, explicitly stated it was doing so for the purpose of having the public defender pursue "a motion for ineffective assistance of [defendant's trial] counsel," who was Jazwiec. See *supra* ¶ 45. Further, the motion that Assistant Public Defender Partowazam filed did just that—namely, his motion argued that defendant was entitled to a new trial because Jazwiec was ineffective and asserted four specific factual bases therefor.

¶ 98 Although it is true that the Illinois Supreme Court has written that "[t]he [*Krankel*] procedure encourages the trial court to fully address [a defendant's ineffective assistance of counsel] claims and thereby narrow the issues to be addressed on appeal" (*People v Roddis*, 2020

IL 124352, ¶ 34), concerns about creating a record and narrowing the issues on appeal arise *only* if the trial court, after conducting a *Krankel* inquiry, determines that it need not appoint new counsel because the defendant's claims lack merit or pertain only to matters of trial strategy. But when, as here, the court has exercised its discretion to appoint new counsel for the defendant with orders for counsel to address the *pro se* ineffective assistance claims, there are no *Krankel* issues left for appellate review.

¶ 99　　　　We state again: *Krankel* inquiries have binary outcomes. A trial court, based upon the defendant's *pro se* claims that his trial counsel was ineffective, will either (1) appoint new counsel to independently evaluate and argue those claims or (2) determine that no new counsel need be appointed. Under option one, the defendant has nothing *Krankel* related to appeal when, as here, new counsel presents those claims. Under option two, the court's decision not to appoint new counsel might well be grounds for appeal either on the merits of the court's decision or on procedural grounds. That is why the Illinois Supreme Court has repeatedly stated that the goal of a *Krankel* inquiry is to (1) promote consideration of the *pro se* claims in the trial court, (2) create a record, and (3) limit issues on appeal (*In re Johnathan T.*, 2022 IL 127222, ¶ 23)—that is, if the defendant appealed the court's decision not to appoint new counsel.

¶ 100　　　　　　　　　　　　　　　3. People v. Boose

¶ 101　　　　This case is not the only one in which a trial court has appointed counsel to investigate a defendant's *pro se* posttrial claims of ineffective assistance of trial counsel based solely upon its review of the defendant's *pro se* filing alleging ineffective assistance and the court's familiarity with the proceedings. In *Boose*, 2025 IL App (4th) 231467, ¶ 34, this court wrote the following:

　　　　　　　"Because of the [trial] court's familiarity with the proceedings [(a jury trial at which

- 24 -

the defendant was convicted of first degree murder)] and previous concern regarding [the defendant's trial counsel's] performance, it immediately appointed *Krankel* counsel to investigate defendant's *pro se* ineffective assistance claims (a decision with which neither of the parties nor this court takes issue)."

¶ 102    In *Boose*, newly appointed counsel filed a motion on the defendant's behalf, requesting a new trial because of the defendant's trial counsel's ineffectiveness. *Id.* The trial court later conducted a hearing on that motion and determined that even though trial counsel's performance was deficient in some respects, the defendant was not prejudiced as a result under the prejudice prong of the United States Supreme Court's test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *Boose*, 2025 IL App (4th) 231467, ¶ 23; see *People v. Peel*, 2018 IL App (4th) 160100, ¶ 39.

¶ 103    This court in *Boose* agreed, holding that "at an adversarial evidentiary hearing conducted pursuant to *Krankel*, a defendant is only entitled to relief upon a determination by the trial court that the defendant has established *both* prongs of the *Strickland* analysis, *i.e.*, deficiency *and* prejudice." (Emphases in original.) *Boose*, 2025 IL App (4th) 231467, ¶ 37.

¶ 104                                    III. CONCLUSION

¶ 105    For the reasons stated above, we affirm the trial court's judgment.

¶ 106    Affirmed.

*People v. Harkey*, 2025 IL App (4th) 230523

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Winnebago County, No. 19-CF-633; the Hon. Joseph G. McGraw, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Christopher McCoy, and Fletcher P. Hamill, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | J. Hanley, State's Attorney, of Rockford (Patrick Delfino, David J. Robinson, and Allison Paige Brooks, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |