NOTICE
Decision filed 05/04/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 240239-U

NO. 5-24-0239

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE
This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 14-CF-215 |
| | ) | |
| MOHAMMED ABUHARBA, | ) | Honorable |
| | ) | Zina R. Cruse, |
| Defendant-Appellant. | ) | Judge, presiding. |

PRESIDING JUSTICE CATES delivered the judgment of the court.
Justices Sholar and Hackett concurred in the judgment.

**ORDER**

¶ 1 *Held*: The circuit court's denial of the defendant's claim of ineffective assistance of counsel after an evidentiary *Krankel* hearing was not manifestly erroneous. The defendant failed to demonstrate ineffective assistance of *Krankel* counsel.

¶ 2 After a bench trial, the defendant, Mohammed Abuharba, was convicted of first degree murder for the death of William Harriel Jr. and sentenced to 50 years in the Illinois Department of Corrections (IDOC). In his first appeal, the defendant challenged his conviction and sentence, and he raised a claim of ineffective assistance of counsel. See *People v. Abuharba*, 2020 IL App (5th) 170073-U. We affirmed the defendant's conviction and sentence and remanded for further *Krankel*[1] proceedings.

---

[1]*People v. Krankel*, 102 Ill. 2d 181 (1984).

1

¶ 3    On remand, the circuit court appointed counsel and held an evidentiary *Krankel* hearing on the issue of ineffective assistance of counsel as it related to the withholding of digital video discs (DVDs) by defense counsel that had been produced in discovery. On January 11, 2024, the circuit court issued a written order finding that the defendant's ineffective assistance of counsel claim did not satisfy the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), and found that there was no reasonable probability that the outcome would have been different based on the defendant's claims. The defendant appeals the January 11, 2024, decision. He argues that the circuit court erred by denying the defendant's claim that defense counsel was ineffective for not allowing the defendant to review discovery DVDs containing evidence discrediting witness testimony implicating the defendant and that he was denied effective assistance of *Krankel* counsel. For the following reasons, we affirm.

¶ 4                                  I. BACKGROUND

¶ 5    The details of the defendant's conviction and sentence were set forth in *Abuharba*, 2020 IL App (5th) 170073-U. For context, we summarize the facts and procedural history that are relevant to this appeal.

¶ 6                                A. Jury Trial Waiver

¶ 7    The defendant requested a bench trial due to potential bias against the defendant if jurors connected his Arabic surname with recent events in California and Paris. The circuit court considered that prospective jurors were unlikely to admit or realize prejudice associating the defendant with those events.

¶ 8    The defendant signed a waiver of his right to a jury trial. The circuit court admonished the defendant on his right to a jury trial. The defendant stated that he understood that he was waiving his right to a jury trial; he had discussed this decision with defense counsel; the defendant was not

2

pressured into proceeding with a bench trial; and he made this decision voluntarily, without pressure or force. The circuit court accepted the waiver.

¶ 9                                                      B. Bench Trial

¶ 10     A bench trial began on January 25, 2016. Witnesses testified to a timeline of the defendant's whereabouts on February 6, 2014. Whitlee Latham testified for the State that she had spoken to William Harriel Jr., her fiancé and the father of her three children, on the phone at approximately 8:20 p.m. on February 6, 2014. The call lasted approximately 16 minutes. William lived with his brother, Joseph Harriel, and the defendant. Latham testified that she heard the defendant's voice in the background during the phone call with William. Latham heard the defendant ask William, "Where's Little Joe at?" During Latham's phone conversation with William, he had asked the defendant if he had heard anything about his television.[2]

¶ 11     Latham testified that she was familiar with the sound of the defendant's voice. She had been introduced to the defendant once in person but had seen him on several occasions when she was with William. She indicated that she was able to hear the defendant in the background during her phone conversations with William. Latham described the defendant's voice as a "soft" and "feminine voice." Latham further testified that she did not believe that the defendant's voice sounded similar to the voices of William's brothers and that she was able to distinguish their voices.

¶ 12     On cross-examination, defense counsel questioned Latham on her video-recorded statement to the police. Specifically, defense counsel asked, "Do you remember telling them that sometimes you confused [the defendant's] voice with another one of his brother's?" Latham

---

[2]About a week prior to William's death, the defendant's television was stolen. Latham testified that she was aware that William had planned on stealing the television and selling it.

3

responded, "Yes, I do remember that." Latham acknowledged that there were times when she had confused the defendant's voice with one of William's brothers.

¶ 13　Nicole Odom testified that, on the evening of February 6, 2014, she heard one gunshot. Odom called 911 after she heard the gunshot and then saw someone lying in the middle of the street. The parties stipulated that Michael Dennis, a telecommunicator for St. Clair County CENCOM, would testify that he received a 911 call at 9:24 p.m. on February 6, 2014, from Nicole Odom.

¶ 14　Josh Easton, a crime scene investigator with the Illinois State Police, indicated that he was informed of the incident at approximately 9:30 p.m. Easton located a fired .32-caliber cartridge casing on the street near the victim. Easton had also attended Harriel's autopsy. A fired projectile was recovered from Harriel's head. The parties stipulated to the testimony of Dr. Raj Nanduri, an expert in the field of forensic pathology, who opined that William's cause of death was "a gunshot wound to the head."

¶ 15　Reann Fears testified that the defendant, whose nickname was "MoMo," arrived at her home at approximately 10 p.m. on February 6, 2014. Fears was in a relationship with David Grinston, whose nickname was "Cool." On February 6, 2014, they were celebrating Grinston's birthday. Fears testified that just for fun she had thrown birthday cake in Grinston's face. Her mother had recorded this on a cellular phone. The defendant was visible in the background of the video recording.

¶ 16　Fears additionally indicated that the defendant appeared normal when he arrived but explained that he started to act "jittery like he was ready to go." The defendant had asked Grinston for a change of clothes to wear, and the defendant changed his shirt and pants at their home. Fears stated she also overheard a conversation between the defendant and Grinston that included

4

"something about a gun and kill." After hearing those words, Fears told Grinston that the defendant needed to leave. The defendant took the clothes that he had worn to the birthday party with him when he left.

¶ 17    On cross-examination, Fears testified that she was diagnosed with bipolar schizophrenia and had issues with her short-term memory. Fears additionally testified that she did not know the reason why the defendant changed clothes and was unsure if it was related to having birthday cake on his clothes.

¶ 18    David Grinston testified that at approximately 10 p.m. on February 6, 2014, the defendant was with him. Fears and her mother were also present. Grinston was friends with the defendant and Grinston was celebrating his birthday that evening. He acknowledged that he had been intoxicated. Grinston testified that at the party, the defendant told Grinston "he ain't getting up from that one." Grinston did not recall the defendant saying the name of the person who was not getting up. He also testified that the defendant stated, "Woo," which was William's nickname, was not "getting up" because he "took one to the head, to the—to the dome." Grinston told the defendant to leave because Grinston did not want to be "around nothing like that."

¶ 19    Grinston additionally stated that the police interviewed him on February 8, 2014, about the murder that occurred on February 6, 2014. Grinston then acknowledged that he had lied to the police because he did not want to be involved. Grinston testified that he later realized, "what's right is right and what's wrong is wrong. And you do wrong, wrong going to come to you." Grinston additionally testified that he had spoken to the defendant's mother on January 15, 2015, and their conversation had been recorded. Grinston testified that he had not been truthful when he spoke to the defendant's mother. He explained that he "wasn't being honest with them because I

5

wanted to see how they felt about me and how they feel about the situation" and he wanted to know if he was "safe or not."

¶ 20    On cross-examination of Grinston, he testified that after the murder, the police came to his house. Grinston acknowledged that he told law enforcement that he had guns at his house. He denied that law enforcement found cannabis at that time because "it was all gone" after his birthday. During Grinston's birthday celebration, his fiancée hit him in the face with birthday cake, and the defendant had cake on him as well. Grinston testified that he was intoxicated on February 6, 2014, and had been drinking and smoking cannabis all day. Grinston estimated that he had consumed approximately 28 beers and "40 blunts." Grinston also testified that he has had memory problems since elementary school.

¶ 21    Defense counsel additionally questioned Grinston regarding the January 15, 2015, recorded conversation with the defendant's mother. Grinston had voluntarily spoken to the defendant's mother. Grinston told her that the defendant had been at his home on February 6, and the defendant had not said anything to Grinston about "Woo" being killed.

¶ 22    The circuit court interjected and questioned Grinston's time frame of when he started drinking and smoking cannabis. Grinston testified that it was over a 12-hour period, and that amount of consumption of cannabis was typical for him. The circuit court additionally questioned Grinston regarding whether he actually remembered the conversation that he had with the defendant on February 6 or if he had made it up. Grinston testified that the conversation with the defendant had occurred.

¶ 23    Defense counsel resumed cross-examination of Grinston, after the circuit court questioned Grinston on whether he was being truthful. Grinston testified that he had viewed the video of being

6

hit with birthday cake before trial and remembered the incident, and stated, "but anything other than that I couldn't really recall it to be honest with you."

¶ 24    Thomas Gamboe, a forensic scientist with the Illinois State Police, was an expert in firearm identification. Gamboe testified that he received the following evidence: a Winchester brand .32-auto caliber discharge case, a .32-caliber fired bullet, and a .22-caliber semiautomatic pistol. Gamboe opined that it was not possible for the .22-caliber pistol to fire a .32-caliber round because the firearm would have been too small to fire that size of a bullet. The murder weapon had not been recovered.

¶ 25    After the State rested, the defendant testified on his own behalf. The defendant indicated that he had arrived at Grinston's house on February 6, 2014, at approximately 9:25 p.m. or 9:30 p.m. Grinston was intoxicated when the defendant arrived. After birthday cake was smashed on Grinston, the defendant changed because he had birthday cake on his clothes as well. The defendant testified that he "hung around for a couple minutes," then left. He denied having a conversation with Grinston about shooting William. The defendant further testified that he had given Grinston a .22-caliber firearm the day before the shooting.

¶ 26    On February 11, 2014, the defendant was in custody and had made a phone call to his brother. The defendant told his brother, "I need you to find Cool, and I need you to—I need you—you know, I need you to get rid of something for me." The defendant explained that he did not want Grinston to face charges for the .22-caliber firearm that the defendant had given him. The defendant further testified that he told his brother, "I need you to hit the streets hard, looking for Cool. And when you find him, you know what I need you to do," and that "I need you to get rid of something for me." The defendant denied killing William.

¶ 27 On cross-examination, the defendant testified that he was interviewed by law enforcement on February 7, 2014. During that interview, the defendant told law enforcement that he was with Grinston on February 6, 2014. The defendant did not believe that the police would have already contacted Grinston by February 11, 2014, when he had the phone call with his brother. The defendant additionally testified that Grinston and the defendant loaned guns to each other, including "a .44 magnum, a .357, a .38 snub nose, .22 calibers, .380s." The defendant denied that Grinston had loaned him a .32-caliber firearm.

¶ 28 After the defendant testified, he moved for a directed judgment of acquittal. The circuit court denied the motion. The parties subsequently presented closing arguments. The circuit court found the defendant guilty of first degree murder and found that during the commission of the offense, the defendant personally discharged a firearm. On April 12, 2016, the circuit court entered a formal written order finding the defendant guilty.

¶ 29                                    C. Posttrial

¶ 30 The defendant subsequently filed a *pro se* motion for a new trial and argued that the circuit court made "inappropriate and unethical comments" about the defendant's family and had inappropriately questioned the State's witness. The defendant included an argument that defense counsel was ineffective for failing to object to the circuit court's comments and questioning.

¶ 31 On June 28, 2016, the circuit court conducted a preliminary *Krankel* hearing. The defendant informed the circuit court that he was given limited access to discovery and was only able to view one of the DVDs produced in discovery. The defendant argued that during trial, he had to inform defense counsel of information that he had learned from viewing one of the DVDs, and that information was necessary to attack Latham's credibility. The defendant believed that he would have been able to contribute more to his defense if he had the opportunity to review all of

8

the DVDs produced in discovery. The circuit court asked the defendant if he had asked defense counsel to review the DVDs before the trial, and the defendant responded, "I believe I did once or twice. I'm not 100 percent sure." The circuit court did not inquire further about the defendant's request to review discovery.

¶ 32    Defense counsel informed the circuit court that he had brought the issue of Latham's credibility to the defendant's attention before questioning Latham. The issue concerning the witness's credibility was fully addressed during cross-examination. The circuit court later issued a written order finding that there was no basis for the defendant's ineffective assistance of counsel claim.

¶ 33    The defendant was sentenced to 50 years in the IDOC followed by 3 years of mandatory supervised release. The defendant moved to vacate his sentence, which the circuit court denied. The defendant appealed his conviction and sentence.

¶ 34                              D. Direct Appeal

¶ 35    In the defendant's first appeal to this court, he argued that the circuit court abused its discretion by permitting testimony concerning weapons that were not connected to the defendant or the death of William; the defendant's *pro se* posttrial allegations of ineffective assistance of counsel showed possible neglect by defense counsel; and that the circuit court had imposed an excessive sentence. See *Abuharba*, 2020 IL App (5th) 170073-U.

¶ 36    We affirmed the defendant's conviction and sentence but remanded for further *Krankel* proceedings where the defendant had demonstrated possible neglect by defense counsel concerning the review of discovery DVDs. We considered that there was insufficient information in the record to support that the circuit court had considered the defendant's *pro se* posttrial claim regarding discovery. The circuit court would not have had knowledge of defense counsel's conduct

9

concerning discovery. The circuit court was directed to appoint *Krankel* counsel and conduct a full *Krankel* evidentiary hearing on the defendant's *pro se* posttrial claims of ineffective assistance of counsel.

¶ 37                              E. Preliminary *Krankel* on Remand

¶ 38    The circuit court held a preliminary *Krankel* inquiry allowing the defendant to state any claims of ineffective assistance of counsel, in addition to the defendant's claim regarding the review of discovery DVDs. The defendant asserted that defense counsel failed to call a witness, who would have testified that Grinston recanted a statement of the defendant's guilt. Grinston's statement had been video recorded, and the video was not introduced at trial. The defendant also asserted that he directed defense counsel to investigate potential witnesses, Damion Adams and Cortez Booze. The defendant explained that Adams had witnessed someone walking through the neighborhood towards William's house on the night of the murder. Booze was seen with William that day, and he was previously arrested for first degree murder. The defendant alleged that defense counsel never contacted these potential witnesses.

¶ 39    The circuit court appointed *Krankel* counsel on remand and allowed *Krankel* counsel to submit a posttrial motion after the preliminary *Krankel* hearing. The State was ordered to turn over the defendant's file to *Krankel* counsel, which included the discovery DVDs. The cause was reset for an evidentiary *Krankel* hearing.

¶ 40                              F. Evidentiary *Krankel* Hearing

¶ 41    The defendant testified at the evidentiary hearing held on March 27, 2023, and claimed that defense counsel did not show him the DVDs received through discovery. Prior to hiring defense counsel, the defendant was represented by a public defender. The defendant was aware of the 60 DVDs in discovery when he was represented by a public defender but had only watched one of

10

the DVDs. The defendant further testified that defense counsel never allowed him to watch all of the DVDs or review the "paper discovery," although he had requested to do so "on multiple occasions."

¶ 42    The defendant further testified that defense counsel never reviewed any of the 60 DVDs. The defendant based his assumption on the fact that he had to assist defense counsel impeach Latham. Specifically, Latham had testified that she heard the defendant's voice in the background during a phone call, which she could distinguish from William's brother's voice. During an interview found on the one DVD that the defendant reviewed, Latham stated that she sometimes confused the defendant's voice with William's brother's voice. The defendant asserted that defense counsel had not been aware of Latham's statement because it was not included in the written report of the conversation. The defendant had to inform defense counsel of Latham's recorded interview on the DVD.

¶ 43    The defendant reviewed the remainder of the DVDs after *Krankel* counsel was appointed on remand. The defendant testified that he learned that Grinston had initially blamed William's shooting on two other individuals, and those other people had been investigated. Grinston also informed law enforcement that the "murder weapon" was the .22-caliber firearm that Grinston turned over to the authorities. The defendant had not been aware that Grinston had referred to the gun as the "murder weapon." The defendant believed that Grinston had lied when he claimed that the .22-caliber firearm was the murder weapon, which affected his credibility. Had the defendant viewed the DVDs prior to trial, Grinston could have been impeached, and the defendant would not have waived his right to a jury trial.

¶ 44    On cross-examination, the defendant acknowledged that he was not prejudiced by defense counsel's questioning of Latham because he had that DVD before trial. The defendant claimed he

11

was focused on Grinston's interview with law enforcement. Specifically, the State questioned the defendant on whether it was possible that Grinston actually believed that the murder weapon was the .22-caliber gun when he turned over the firearm to law enforcement. The defendant responded, "I can't speak on what he thinks. I just—I just know what he said. And I know that it's a fact that it's a lie. I don't—I can't speak of what he thinks." The defendant responded that he believed that Grinston was lying when he claimed the .22-caliber gun was the murder weapon and he did not have the opportunity to address the credibility of Grinston's statement because the defendant was not provided with that evidence. The State questioned the defendant on whether Grinston could have simply been mistaken because Grinston believed, at the time he turned in the weapon, that it was the murder weapon. The defendant responded that he did not believe that Grinston was mistaken. He thought that Grinston was lying. The defendant additionally acknowledged that two other individuals named by Grinston as possible suspects during the law enforcement interview had not been mentioned at trial.

¶ 45    The defendant additionally testified, on cross-examination, that he could not recall how many times he had met with defense counsel prior to trial, stating: "I couldn't give you a roundabout answer, whether it was 10, 20, 3." He explained that he was unable to recall if he had 3 or 20 meetings with defense counsel because "this was seven years ago." The defendant acknowledged that he had been aware of the 60 DVDs and had not notified the circuit court prior to trial that he had not reviewed the discovery. The defendant explained that he thought he had "enough" to proceed with the trial, and after the trial began, he realized that defense counsel had not watched all of the DVDs because "he didn't know all of the evidence." The defendant claimed that he asked to watch the DVDs and defense counsel did not show him discovery.

12

¶ 46    The defendant's counsel at trial testified that he had received discovery, including written narrative reports and documents and approximately 60 DVDs. He watched the DVDs in preparation for trial. Defense counsel remembered that Grinston and Fears were witnesses at the defendant's trial. He specifically testified that he had watched the law enforcement interviews of Grinston and Fears on the DVDs prior to trial. In preparation for trial, defense counsel met with the defendant and discussed witnesses and anticipated evidence that the State would present. Defense counsel could not recall whether the defendant had requested to watch the DVDs, and he testified that he did not withhold discovery from the defendant.

¶ 47    Defense counsel acknowledged that he had a conversation with the defendant, during trial, regarding one of the DVDs. Defense counsel recalled questioning the witness at trial based on his conversation with the defendant. Additionally, testimony regarding the .22-caliber firearm was introduced at trial, along with testimony that the .22-caliber firearm could not have been the murder weapon. Defense counsel believed that the defendant's knowledge of Grinston referring to the firearm as a "murder weapon" would not have altered the outcome of the trial. There were issues known to defense counsel surrounding Grinston's knowledge of the murder weapon, and that the victim had not been killed by the .22-caliber firearm in evidence.

¶ 48    With regard to the allegations regarding two other murder suspects, defense counsel indicated he was aware of other suspects at the time of the trial but could not recall a conversation with the defendant about Grinston naming two other suspects. The conversation, however, would have occurred six or seven years ago, and defense counsel was unable to recall every conversation or piece of evidence. He would have been aware of the information included in discovery at that time. Defense counsel did not recall questioning Grinston at trial on the other two suspects named in his law enforcement interview.

13

¶ 49 The circuit court then addressed defense counsel regarding the review of discovery. Defense counsel testified that he had watched all of the DVDs that he received through discovery.

¶ 50 At the conclusion of the testimony, *Krankel* counsel argued that the proof demonstrated that the defendant did not have the opportunity to review all of the discovery and that the defendant was able to assist defense counsel impeach Latham, a critical witness from the one DVD he watched, who admitted she had confused the defendant's voice before William's death. The DVDs included further information that *Krankel* counsel argued could have been used to impeach another critical witness in the case, Grinston, who had turned in what he thought was the murder weapon. But for defense counsel's errors and negligence, *Krankel* counsel argued there was a reasonable probability that the results would have been different, and that the defendant would have chosen a jury trial had he reviewed the DVDs.

¶ 51 The State argued that defense counsel had reviewed the discovery, had watched the DVDs, and denied withholding discovery from the defendant. Defense counsel had discussed the case with the defendant before trial and discussed the defendant's decision to waive a jury trial. The State additionally argued that the defendant had not demonstrated prejudice under the "*Strickland* analysis." The fact that Grinston produced a gun to law enforcement indicated that he believed it to be the murder weapon. There was also a distinction between lying and being mistaken. The State argued that the defendant had not demonstrated that any possible impeachment would have been prejudicial to the outcome of the case. After argument by the parties, the circuit court took the matter under advisement.

¶ 52 A formal written order was entered on January 11, 2024, finding that the defendant had not demonstrated that defense counsel was ineffective in accordance with the *Strickland* standard. The circuit court's findings regarding the 60 DVDs in discovery included that,

14

"prior to trial, the Defendant did not review them; One of his first attorneys gave him a summary of her review of the contents of the 60 DVDs, he reviewed only one of the DVDs with a different counsel, and Defendant's trial attorney stated that he himself watched all of the DVDs, but that the Defendant did not ask to watch the DVDs; Defendant stated that he did ask to watch the DVDs."

The order additionally addressed that the defendant assisted defense counsel with the impeachment of a witnesses during trial based off of a statement that the witness made in an interview that was on the one DVD that the defendant had watched. The defendant had the opportunity to review the DVDs after the case was remanded.

¶ 53    The circuit court's written order also addressed that during the *Krankel* hearing, the defendant claimed that Grinston could have been impeached because he had mentioned two alternative suspects during an interview with law enforcement, and that Grinston's credibility could have been questioned because he told law enforcement that he was turning over the murder weapon, but the weapon was not the caliber of the weapon that killed William Harriel. The circuit court found that there was no reasonable probability that the outcome of the trial would have been different after reviewing the DVDs of the interviews referenced by the defendant. The circuit court denied the defendant's ineffective assistance of counsel claim as it did "not satisfy the *Strickland* standard." This appeal followed.

¶ 54                                    II. ANALYSIS

¶ 55    On appeal, the defendant argues that the circuit court erred by denying his *Krankel* motion where the defendant claims that he demonstrated ineffective assistance of defense counsel regarding the review of discovery, and that the defendant would not have waived his right to a jury trial had he had the opportunity to review discovery. The defendant additionally argues that *Krankel* counsel was ineffective for failing to argue that defense counsel was deficient for failing to completely review discovery.

15

¶ 56 Criminal defendants have a constitutional right to effective assistance of counsel. *People v. Hale*, 2013 IL 113140, ¶ 15. Claims of ineffective assistance of counsel are governed by a two-pronged test established in *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, to establish a claim of ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient, and (2) the deficient performance resulted in prejudice. *People v. Hughes*, 2012 IL 112817, ¶ 44.

¶ 57 A defendant must overcome the "strong presumption" that defense counsel's performance was a matter of sound trial strategy to satisfy the first prong of *Strickland*. *People v. Walton*, 378 Ill. App. 3d 580, 587 (2007). "Decisions regarding which items received in discovery that a defense attorney chooses to share with or discuss with his or her client is a matter of trial strategy." *People v. Walker*, 2019 IL App (3d) 170374, ¶ 18. There is a strong presumption that defense counsel's decisions stem from sound trial strategy rather than incompetence. *Walker*, 2019 IL App (3d) 170374, ¶ 18. A defendant may be able to rebut that presumption by showing that defense counsel's decision to withhold discovery cast doubt on the State's ability to prove him guilty. *Walker*, 2019 IL App (3d) 170374, ¶ 18. A defendant must also prove that a reasonable probability exists, that the trial result would have been different but for counsel's unreasonable performance, to satisfy the second prong of *Strickland*. *Walton*, 378 Ill. App. 3d at 587. Both prongs of the *Strickland* test must be satisfied by a defendant. *Walton*, 378 Ill. App. 3d at 587.

¶ 58 A *Krankel* proceeding creates a record establishing a factual basis for the defendant's *pro se* claim of ineffective assistance of counsel. *In re Johnathan T.*, 2022 IL 127222, ¶ 43. The purpose of a *Krankel* proceeding is to facilitate the circuit court's "full consideration" of a defendant's ineffective assistance of counsel claims and to limit the issues on appeal. *People v. Boose*, 2025 IL App (4th) 231467, ¶ 37.

¶ 59 The defendant is entitled to relief if the circuit court determines at an adversarial evidentiary hearing conducted pursuant to *Krankel* that a claim of ineffective assistance of defense counsel satisfied both prongs of the requirements of the *Strickland* analysis. *Boose*, 2025 IL App (4th) 231467, ¶ 37. The applicable standard of review depends on whether the circuit court determined the merits of the defendant's *pro se* posttrial ineffective assistance of counsel claims. *People v. Jackson*, 2020 IL 124112, ¶ 98. We apply *de novo* review when considering whether the circuit court properly conducted a preliminary *Krankel* inquiry. *Jackson*, 2020 IL 124112, ¶ 98. If the circuit court properly conducted a *Krankel* inquiry and reached a determination on the merits, we will reverse only if the circuit court's action was manifestly erroneous. *Jackson*, 2020 IL 124112, ¶ 98. "Manifest error is error that is clearly evident, plain, and indisputable." *Jackson*, 2020 IL 124112, ¶ 98.

¶ 60                                    A. Defense Counsel

¶ 61 The defendant claims that he demonstrated that defense counsel was ineffective for refusing to allow the defendant to review the DVDs in discovery and, therefore, the defendant was not fully able to participate in his defense. The defendant reviewed the discovery DVDs, prior to the evidentiary *Krankel* hearing, and learned that Grinston had initially named two other potential suspects and had claimed that a .22-caliber firearm that he gave to the police was the "murder weapon." The defendant claims that had he known these facts prior to trial, there was a reasonable probability of a different trial outcome, and he would not have waived his right to a jury trial, and the circuit court erred in its decision.

¶ 62 The defendant's argument hinges on his claim that no reasonable attorney would have withheld discovery from the defendant where his trial strategy focused on discrediting the witnesses. See *Walker*, 2019 IL App (3d) 170374, ¶ 18. However, conflicting testimony was

17

presented during the March 27, 2023, *Krankel* hearing regarding the withholding of discovery. The defendant testified at the evidentiary *Krankel* hearing that he was aware that there were 60 DVDs in discovery prior to trial; he had repeatedly requested to review those DVDs; and defense counsel refused to show the defendant the discovery. We note that during the initial preliminary *Krankel* hearing held on June 28, 2016, the defendant testified that he believed that he had asked defense counsel "once or twice," but he was "not 100 percent sure."

¶ 63 Defense counsel, on the other hand, testified during the March 27, 2023, *Krankel* hearing that he could not recall a conversation where the defendant had requested to watch the DVDs, and he would not have withheld any discovery from the defendant. Defense counsel additionally testified that he had reviewed the entirety of the discovery, including the 60 DVDs, and discussed any anticipated evidence that the State would present with the defendant. Both defense counsel and the defendant acknowledged that the trial was held approximately seven years prior to the *Krankel* hearing, and both had issues recalling the details of their meetings.

¶ 64 The circuit court acknowledged the conflicting testimony at the *Krankel* hearing and focused on the prejudice prong of *Strickland*. We consider whether the defendant has demonstrated that there was a reasonable probability that the outcome of the trial would have changed had the defendant reviewed the 60 DVDs prior to trial. The defendant claims that the DVDs contained impeaching information. Specifically, during an interview with law enforcement, Grinston named two suspects other than the defendant and claimed that the firearm recovered from his possession was the murder weapon.

¶ 65 If a witness gives testimony at trial that conflicts with their earlier statement, the prior statement can be introduced to challenge the witness's credibility. *People v. Guerrero*, 2021 IL App (2d) 190364, ¶ 44. "The purpose of impeaching evidence is to destroy the credibility of a

18

witness and not to establish the truth of the impeaching evidence." *People v. Bradford*, 106 Ill. 2d 492, 499 (1985).

¶ 66    The defendant has not claimed that testimony regarding the two potential suspects named at trial would have been relevant to his defense. The defendant merely suggests that Grinston's statement proved that he was not truthful during his interview with law enforcement. However, no testimony was presented at trial regarding those two potential suspects. Furthermore, at trial, Grinston admitted that he was not honest during his police interview because he did not want to be involved.

¶ 67    The defendant also claims that he was prejudiced by defense counsel's refusal to inform the defendant of discovery where Grinston referenced the .22-caliber firearm as the "murder weapon." The .22-caliber firearm was collected as evidence and defense counsel treated the .22-caliber firearm as if law enforcement had, at some point, considered it to be the murder weapon. Evidence was presented at trial that the .22-caliber firearm could not possibly have been the murder weapon because it was too small to fire the bullet that killed William.

¶ 68    The defendant was also aware of the .22-caliber firearm in evidence at trial. The defendant testified at trial that he had given Grinston the .22-caliber firearm the day before the murder. He also testified that while he was in custody, on a recorded phone call, the defendant directed his brother to have Grinston "get rid of something for me." The defendant indicated that Grinston and the defendant loaned multiple guns to each other. Considering this testimony, defense counsel's decision not to question Grinston on a firearm, that was not the murder weapon, was sound trial strategy when the murder weapon had not been recovered. The defendant has not demonstrated that the alleged withholding of discovery that revealed Grinston referred to the .22-caliber firearm as the "murder weapon" was prejudicial to his defense.

19

¶ 69    The trier of fact is best equipped to judge the credibility of witnesses, and the trier of fact's credibility findings are entitled to great weight. *People v. Wheeler*, 226 Ill. 2d 92, 114-15 (2007). During the trial, the circuit court considered Grinston's credibility, as well as the defendant's and the other witnesses. Additionally, the circuit court was in the best position to judge the credibility of the witnesses during the *Krankel* hearing. The discovery DVDs, including Grinston's interview with law enforcement, were reviewed by the circuit court as well. The circuit court concluded that the outcome of the trial would not have been different after reviewing the DVDs.

¶ 70    The defendant additionally claims that he would not have waived his right to a jury trial had he known the information included in the discovery DVDs. A valid jury waiver must be knowingly and understandingly made. *People v. Frey*, 103 Ill. 2d 327 (1984). "Whether a jury waiver is valid cannot be determined by application of a precise formula, but rather turns on the particular facts and circumstances of each case." *People v. Bracey*, 213 Ill. 2d 265, 269 (2004). "Generally, a jury waiver is valid if it is made by defense counsel in defendant's presence in open court, without an objection by defendant." (Internal quotation marks omitted.) *People v. Hutt*, 2023 IL 128170, ¶ 30.

¶ 71    The defendant executed a written jury waiver and was admonished with regard to his right to a jury trial. The defendant was aware of the 60 DVDs in discovery when he waived his right to a jury. The defendant stated that he understood that he was waiving his right to a jury trial; he had discussed this decision with defense counsel; the defendant was not pressured into proceeding with a bench trial; and he made this decision voluntarily, without pressure or force.

¶ 72    The defendant asserted at the *Krankel* hearing that defense counsel was ineffective because the defendant would have proceeded with a jury trial if he had the opportunity to review the DVDs. The defendant, however, requested a bench trial based on potential bias by the jury due to his

ethnicity and recent world events. The defendant does not address how the information he learned after the trial would have alleviated his concerns for the potential of jury bias due to his ethnicity.

¶ 73   The defendant has not demonstrated that a reasonable probability exists that the trial result would have been different or that he would have requested a jury trial based on defense counsel's handling of discovery. If an ineffective assistance claim may be resolved on the basis that the defendant did not experience prejudice, we need not determine whether counsel's performance was constitutionally deficient. *People v. Morgan*, 187 Ill. 2d 500, 530 (1999). As such, the defendant has not demonstrated that defense counsel was ineffective, as there was no prejudice to the defendant. Thus, the circuit court's decision to deny the defendant's claim of ineffective assistance of defense counsel after an evidentiary *Krankel* hearing on the merits was not manifestly erroneous.

¶ 74                               B. *Krankel* Counsel

¶ 75   The defendant may raise ineffective assistance of counsel claims against *Krankel* counsel, and those claims are governed by the standards of representation set forth in *Strickland*, 466 U.S. 668. *People v. Cherry*, 2016 IL 118728, ¶ 29. As such, the defendant must demonstrate that *Krankel* counsel's performance was deficient where it fell below an objective standard of reasonableness, and the deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at 687-88. We review ineffective assistance of counsel claims *de novo*. *In re Harlin H.*, 2022 IL App (5th) 190108, ¶ 78.

¶ 76   *Krankel* counsel independently evaluates the defendant's claims of ineffective assistance of defense counsel. *People v. Moore*, 207 Ill. 2d 68, 78 (2003). *Krankel* counsel should review the entire record, including pretrial and trial transcripts, and meet with the defendant regarding any potential claims of ineffective assistance of counsel. *People v. Harkey*, 2025 IL App (4th) 230523,

21

¶ 78. The role of *Krankel* counsel is limited to investigating the defendant's *pro se* claims of ineffective assistance of defense counsel and does not extend to pursuing other claims of error. *Harkey*, 2025 IL App (4th) 230523, ¶ 77. *Krankel* counsel bears an ethical responsibility to refrain from pursuing frivolous claims. *People v. Downs*, 2017 IL App (2d) 121156-C, ¶ 48.

¶ 77    The defendant claims *Krankel* counsel was ineffective for failing to support the ineffective assistance of defense counsel claim with Grinston's recorded statement. This claim is without merit. The record demonstrates that *Krankel* counsel received the discovery DVDs, the defendant reviewed the DVDs, and the recording of Grinston's interview was admitted into evidence. The written order also indicated that the circuit court reviewed the DVDs of the interviews referenced by the defendant and found that the outcome of the trial would not have been different based on the information included in the DVDs.

¶ 78    The defendant additionally claims that *Krankel* counsel was ineffective for failing to argue that defense counsel never watched the discovery DVDs. The issue of whether defense counsel reviewed the DVDs was directly addressed at the *Krankel* hearing. Defense counsel testified that he had watched all of the DVDs that he received through discovery. The circuit court was able to judge the credibility of the witnesses and the evidence presented during the *Krankel* hearing. See *Wheeler*, 226 Ill. 2d at 114-15.

¶ 79    The defendant has not demonstrated deficient performance by *Krankel* counsel that would have prejudiced the defendant. Thus, the defendant failed to demonstrate that *Krankel* counsel provided ineffective assistance.

¶ 80                                        III. CONCLUSION

¶ 81    For the foregoing reasons, we affirm the decision of the circuit court of St. Clair County.

¶ 82    Affirmed.

22